In The United States District Court For The
Northern District Of Illinois, Western Division

Eric E. Bernard,
    Plaintiff,

v.

Rob Jeffreys,
    Defendants

Case No. 20-CV-50412

Judge Iain Johnston

**FILED**
11/15/2021 JF
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**PC SCAN**

## Motion For Preliminary Injunction And Temporary Restraining Order

Now Comes The Plaintiff, Eric E. Bernard, moving this Court to grant his Motion For Preliminary Injunction And Temporary Restraining Order pursuant to Federal Civil Procedure Rule 65 and states as follows:

1. Plaintiff is currently housed at Dixon Correctional facility in the Health Care Unit and has been housed there since September 2019.

2. Dixon facility nor any facility within the Illinois Department Of Correction has a unit for the physically and mentally impaired prisoners.

3. Dixon Facility is not accommoding nor antisipating plaintiff's disability needs.

4. The lack of ADA equitment/and improper equitment has injuried and continue to injury plaintiff.

5. Plaintiff body is detorating due to not recieving comprehensive therapy and occupational therapy.

6. Plaintiff is being denied proper self care assistance by medical staff, which led to him having skin infection

7. Plaintiff is being subjected to cruel and unusual punishment by the IDOC and it's Medical Providers by failing to provide plaintiff with self care Assistance while outside the facility at Court and Hospitals

8. Due to the total isolation and lack of socialization with his peers, plaintiff is at high risk for suicide as his mental illnesses continue to worsen.

9. The IDOC is denying plaintiff access to programs, activities and other privileges based solely on his disability and fail to make reasonable accommodations in violation of the Americans with Disabilities Act 42 U.S.C § 12132 and Rehabilitation Act 29 U.S.C. § 794(A)

10. Plaintiff has addressed these above issues with Wardens and IDOC Director but nothing has been done.

11. Plaintiff request that this court uses it's authority and grant injunctive Relief.

# Factual History

## Mental Health.

12. Plaintiff has been diagnosed with Post Traumatic Stress Disorder (PTSD); Schizo Affective Bipolar Disorder; Anti and Borderline Personality Disorder (see exhibit # 1 and 2)

13. Plaintiff has a lifetime history of recieving a high level of Mental Health care to some what control his Mental Health Disorders.

14. Plaintiff has a history of near fatal self harm and suicide attempts (see exhibit #1, 2)

15. Plaintiff has been under Residential Treatment Unit (RTU) level of care in the Illinois Department of Corrections since 2016.

16. Plaintiff has not been recieving adequate Mental Health care since being at Dixon facility (see exhibit #1)

17. Plaintiff, his attorneys, Pablo Stewart (appointed court monitor in class action Rasho v. Baldwin, No. 2007-1298) and other Mental Health staff at Dixon facility — that due to the lack of out cell time; isolation; no socialization with peers is causing plaintiff to self harm, high risk to suicide and a threat to himself and that he is mentally detiorating — to DOC staff but no actions have yet been taken

## MEDICAL

19. In MARCH 2019, plaintiff suffered from several brain infections, which resulted in him suffering from a stroke, which left him physically impaired to the point were he cant walk, sit up, sit in a regular wheel chair and needs assistance eating/bathing/clothing etc.

20. Due to plaintiff's high need of self care assistance, he is housed in the Dixon Correctional Center's infirmary.

   plaintiff is confined to his bed and geriactrics chair and is need of full assistance. (SEE EXHIBIT # 1)

21. plaintiff has filed grievances to it's higher level requesting proper care and accommodations but the DOC refuse to take any actions

   <u>Need for Temporary Restraining Order and</u>
   <u>Need for Prelimary Injunction.</u> The DOC'S

   <u>Failure to provide care and Accommodations by:</u>

22. Not providing plaintiff adequate self care assisoante outside and inside the facility;

23. Shortage of staff (medical and security);

24. Lack of functional ada assistive devices/equitment (including Hoyer lift, geri chair, automatic medical beds);

26. Not monitoring staffs behavior and inmates behavior as to being assaultive/being inappropriate/not providing care for plaintiff and other offenders who is under self care status;

27. Authorizing untrained inmates to operate medical equitment/devices and provide self care assistance to plaintiff and others;

28. Violating plaintiff's privacy and for his naked body not to be exposed to other inmates and bypassing staff;

29. Denying plaintiff out of cell unstructured and structured time;

30. Has plaintiff isolated with no socialization to others;

31. Failure to create a mental health treatment plan that will reduce the high risk of self harm and suicide;

32. Failure for the wardens to follow plaintiff's mental health treatment plans;

33. Failure to provide plaintiff with occupational therapy; failure to provide plaintiff with intensive physical therapy;

34. FAILURE TO ACCOMMODATE PLAINTIFF WITH TELEVISION AND RADIO WITH REMOTE CONTROLS AND SPEAKERS;

35. FAILING TO PROVIDE PLAINTIFF WITH AN ADEQUATE MEDICAL TREAT PLAN AND SELF CARE DAILY PLAN.

36. FAILURE TO MAKE ACCOMMODATIONS FOR PLAINTIFF TO HAVE ACCESS TO THE LAW LIBRARY;

37. FAILING TO ACCOMMODATE RELIGIOUS SERVICE AND MEDITATION;

38. FAILING TO ALLOW ACCESS TO SCHOOLING;

39. FAILING TO ORDER AUTOMATIC GERI CHAIR;

40. FAILING TO RECONSTRUCT THE FACILITY SIDEWALKS;

41. FAILING TO SEND PLAINTIFF TO OUTSIDE FOR DENTAL CARE OR ORDER PORTABLE DENTAL X-RAY MACHINE, ADA DENTAL CARE AND CREATE A PLAN TO CLEAN AND FLOSS PLAINTIFF'S TEETH;

42. FAILING TO PROPERLY TRAIN CERTIFIDE NURSE ASSISTENTS ON HOW TO PROVIDE SELF CARE TO PLAINTIFF;

43. FAILING TO MONITOR MEDICAL STAFF TO ASSURE THAT CARE AND PRIVILEGES ARE BEING OFFERED TO PLAINTIFF;

# Risk Of Suffering a Irreparable Harm In Absence Of Preminary Injunction

## Hoyer Lift

Plaintiff's currently unable to sit in wheelchair because he has been laying on his backside in bed or geri chair. Plaintiff's body is becoming in a fixed position of laying flat. The facility doesn't have a hoyer lift that's suitable for a person in plaintiff's position or a person with contractors. The current hoyer lift is designed for persons who are flexible (which plaintiff is not). Once attached to the hoyer lift and lifted, it forces plaintiff's body to curl or fold up into a face to the knee position, which will cause plaintiff's body to go back to the laying flat position but it cant because the hoyer lift is holding plaintiff's body in the folded up position, this causes severe pain to plaintiff's joints and causes the body jerking, shaking and battling between being in a position that the body is rejecting, versus, plaintiff body going back to it's normal postision. Not only is this causing plaintiff extreme pain but also damaging his joints and muscles plus not being able to participate in the basic physical therapy when it's offered.

Plaintiff has made countless request to the facility and DOC director to get a hoyer lift that's suitable for his condition but they refuse to do so.

The hoyer lift slings is not secured and safe, plaintiff has fallen out of them
(see exhibit #1)

The current hoyer lift is damaging plaintiff joints, body and causing pain and interfering with participating in physical therapy.

# Geriatric Chair

Plaintiff spends most of time in his Geri Chair, days, weeks and months. The prison uses these for individuals who's in plaintiff's condition. The Geri Chair is not designed for transportation purposes, however, the prison uses it for transportation. The Geri Chair that plaintiff is currently in and has been in since at Dixon Facility (over two years) the leather interior is ripped away on the arm and head rest and rear area, all were the inside cushion is exposed and soaked with urine, feces, milk, vomit, blood and pepper spray. There's areas on the arm rest were sharp metal is exposed and strews sticking out (which cutted plaintiff on countless occasions. Plaintiff and his attorney request the facility to order a new Geri Chair (atfer visiting plaintiff and witnessing the Geri Chair condition first hand) but the facility continues to leave plaintiff in the same chair. New Geri Chairs can be ordered and other prisoners got new Geri Chairs but plaintiff is not being given a new chair because of retaliation of filing grievances and lawsuits against the facility. (see exhibit 1)

Plaintiff already has skin infection, sitting in the toxics that's in the cushion inside, only exacerbates the infection.

## Using Prisoners To Provide Self Care

Plaintiff is being subjected to abuse by other prisoners under instructions off staff. (see exhibit #1 and 4)

# Dental Care

Dixon Facility does not have an ADA dental chair or ADA dental x-ray machine. Plaintiff has been in Dixon Facility since September 6, 2019, with broken tooths, known decaying and cavities, and sharp pen hanging/sticking down out his front tooth. Dixon Facility refused to provide dental care based solely on plaintiff's disabilities and refused to accommodate. It wasn't until the filing of this law suit and service on defendant, were dental service attempted to take actions in August 2021. Staff was unable to properly secure plaintiff in the normal dental chair but tried to hold plaintiff in place while the dentist performed oral care. The dentist was able to remove the sharp pen and do two fillins but unable to fix cavity and decaying all the way because the dentist couldn't get in the right position due to tight space and staff struggling to hold plaintiff in place. Plaintiff has not recieved an x-ray and has an infection in his tooth and gum from the lastest inadequate dental care. Plaintiff can not eat, has pain in his gum and tooth, has migrane from cavity and infection. Plaintiff is at risk of full gum infection and losing all his teeth. (see exhibit #)

# Mental Health

Plaintiff is at risk of his Mental Health state of mind exacerbating due to not being able to socialize with his peers and have groups and day rooms with his peers. Plaintiff's Mental Health Treatment plan includes "Groups" two times a week (see exhibit #3) plaintiff has not been offered groups with peers since being at Dixon Facility based solely on his disabilty. All other Mentally ill prisoners are offered groups with their peers. Due to the lack of socialization plaintiff has attempted suicide numberous times. Mental Health staff has expressed to Dixon Staff the high risk and danger of plaintiff commiting suicide (see exhibit # 123

Plaintiff is being denied out of cell unstructured time as required by Administrative / Institutional Directives and plaintiff's Mental Health's treatment plan, leaving plaintiff in isolation. This isolation is exacerbating plaintiff's Mental illnesses and putting him at high risk self harm and suicide. (see exhibit 123)

In The United States District Court For The
Northern District Of Illinois, Western Division

Eric E. Bernard,
    Plaintiff,

v.

Rob Jeffreys,
    Defendants

Case No. 20-CV-50412

Judge Iain Johnston

---

## Motion For Preliminary Injunction And Temporary Restraining Order

   Now Comes The Plaintiff, Eric E. Bernard, Moving This Court To Grant His Motion For Preliminary Injunction And Temporary Restraining Order pursuant To Federal Civil Procedure Rule 65 And states As follows:

1. Plaintiff Is currently Housed At Dixon Correctional Facility In The Health Care Unit And Has Been Housed There Since September 2019.

2. Dixon Facility Nor Any Facility Within The Illinois Department Of Correction Has A Unit For The Physically And Mentally Impaired Prisoners.

3. Dixon Facility is not accommoding nor antisipating plaintiff's disability needs.

4. The lack of ADA equitment/and improper equitment has injuried and continue to injury plaintiff.

5. Plaintiff body is detorating due to not recieving comprehensive therapy and occupational therapy.

6. Plaintiff is being denied proper self care assistance by medical staff, which led to him having skin infection

7. Plaintiff is being subjected to cruel and unusual punishment by the IDOC and it's medical providers by failing to provide plaintiff with self care assistance while outside the facility at court and hospitals

8. Due to the total isolation and lack of socialization with his peers, plaintiff is at high risk for suicide as his mental illnesses continue to worsen.

9. The IDOC is denying plaintiff access to programs, activities and other privileges based solely on his disability and fail to make reasonable accommodations in violation of the Americans with Disabilities Act 42 U.S.C § 12132 and Rehabilitation Act 29 U.S.C. § 794 (A)

10. Plaintiff has addressed these above issues with Wardens and IDOC director but nothing has been done.

11. Plaintiff request that this court uses it's authority and grant injuntive Relief,

# Factual History

## Mental Health.

12. Plaintiff has been diagnosed with Post Traumatic Stress Disorder (PTSD); Schzo Affective Bi polar Disorder; Anti and Berdeline Personality Disorder (See Exhibit # 1 and 2)

13. Plaintiff has a lifetime history of recieving a high level of Mental Health care to some what control his Mental Health Disorders.

14. Plaintiff has a history of near fatal self harm and suicide attempts (see Exhibit # 1, 2)

15. Plaintiff has been under Residential Treatment Unit (RTU) level of care in the Illinois Department of Corrections since 2016.

16. Plaintiff has not been recieving adequate Mental Health care since being at Dixon Facility (see Exhibit # )

17. Plaintiff, his attorneys, Pablo Stewart (Appointed court Monitor in class action Rasho V. Baldwin, No. 2007-1298) and other Mental Health staff at Dixon facility — that due to the lack of out cell time; isolation; no socialization with peers is causing Plaintiff to self harm, high risk to suicide and a threat to himself and that he is mentally detiorating — to DOC staff but no actions have yet been taken

# MEDICAL

19. In MARCH 2019, plaintiff suffered from several brain infections, which resulted in him suffering from a stroke, which left him physically impaired to the point were he cant walk, sit up, sit in a regular wheel chair and needs assistance eating/bathing/clothing etc.

20. Due to plaintiff's high need of self care assistance, he is housed in the Dixon Correctional Center's infirmary.

plaintiff is confined to his bed and geriactrics chair and is need of full assistance. (see exhibit # 1)

21. plaintiff has filed grievances to it's higher level requesting proper care and accommodations but the DOC refuse to take any actions

Need For Temporary Restraining Order and Need For Prelimary Injunction. The DOC'S Failure to provide care and accommodations by:

22. Not providing plaintiff adequate self care assisance outside and inside the facility;

23. Shortage of staff (Medical and Security);

24. lack of functional ada assistive devices/equitment (including Hoyer lift, Geri chair, automatic medical beds);

26. Not monitoring staffs behavior and inmates behavior as to being assaultive/being inappropriate/not providing care for plaintiff and other offenders who is under self care status;

27. Authorizing untrained inmates to operate medical equiptment/devices and provide self care assistance to plaintiff and others;

28. Violating plaintiff's privacy and for his naked body not to be exposed to other inmates and bypassing staff;

29. Denying plaintiff out of cell unstructured and structured time;

30. Has plaintiff isolated with no socialization to others;

31. Failure to create a mental health treatment plan that will reduce the high risk of self harm and suicide;

32. Failure for the wardens to follow plaintiff's mental health treatment plans;

33. Failure to provide plaintiff with occupational therapy; Failure to provide plaintiff with intensive physical therapy;

34. FAILURE TO ACCOMMODATE PLAINTIFF WITH TELEVISION AND RADIO WITH REMOTE CONTROLS AND SPEAKERS;

35. FAILING TO PROVIDE PLAINTIFF WITH AN ADEQUATE MEDICAL TREAT PLAN AND SELF CARE DAILY PLAN.

36. FAILURE TO MAKE ACCOMMODATIONS FOR PLAINTIFF TO HAVE ACCESS TO THE LAW LIBRARY;

37. FAILING TO ACCOMMODATE RELIGOUS SERVICE AND MEDITATION;

38. FAILING TO ALLOW ACCESS TO SCHOOLING;

39. FAILING TO ORDER AUTOMATIC GERI CHAIR;

40. FAILING TO RECONSTRUCT THE FACILITY SIDEWALKS;

41. FAILING TO SEND PLAINTIFF TO OUTSIDE FOR DENTAL CARE OR ORDER PORTABLE DENTAL X-RAY MACHINE, ADA DENTAL CARE AND CREATE A PLAN TO CLEAN AND FLOSS PLAINTIFF'S TEETH;

42. FAILING TO PROPERLY TRAIN CERTIFIDE NURSE ASSISTANTS ON HOW TO PROVIDE SELF CARE TO PLAINTIFF;

43. FAILING TO MONITOR MEDICAL STAFF TO ASSURE THAT CARE AND PRIVILEGES ARE BEING OFFERED TO PLAINTIFF;

## Risk Of Suffering a Irreparable Harm In Absence Of Preminary Injunction

### Hoyer Lift

Plaintiff's currently unable to sit in wheelchair because he has been laying on his backside in bed or geri chair. Plaintiff's body is becoming in a fixed position of laying flat. The facility doesn't have a hoyer lift that's suitable for a person in plaintiff's position or a person with contractors. The current hoyer lift is designed for persons who are flexible (which plaintiff is not). Once attached to the hoyer lift and lifted, it forces plaintiff's body to curl or fold up into a face to the knee position, which will cause plaintiff's body to go back to the laying flat position but it can't because the hoyer lift is holding plaintiff's body in the folded up position, this causes severe pain to plaintiff's joints and causes the body jerking, shaking and battling between being in a position that the body is rejecting, versus, plaintiff body going back to it's normal postision. Not only is this causing plaintiff extreme pain but also damaging his joints and muscles plus not being able to participate in the basic physical therapy when it's offered.

Plaintiff has made countless request to the facility and DOC Director to get a hoyer lift that's suitable for his condition but they refuse to do so.

The Hoyer lift slings is not secured and safe, plaintiff has fallen out of them (see exhibit #1)

The current hoyer lift is damaging plaintiff joints, body and causing pain and interfering with participating in physical therapy.

# Geriactric Chair

Plaintiff spends most of time in his Geri Chair, Days, weeks and months. The prison uses these for individuals who's in plaintiff's condition. The Geri Chair is not designed for transportation purposes, however, the prison uses it for transportation. The Geri Chair that plaintiff is currently in and has been in since at Dixon facility (over two years) the leather interior is ripped away on the arm and head rest and rear area, all were the inside cushion is exposed and soaked with urine, feces, milk, vomit, blood and pepper spray. There's areas on the arm rest were sharp metal is exposed and strews sticking out (which cutted plaintiff on countless occasions. Plaintiff and his attorney request the facility to order a new Geri Chair (atfer visiting plaintiff and witnessing the Geri Chair condition first hand) but the facility continues to leave plaintiff in the same chair. New Geri Chairs can be ordered and other prisoners goot new Geri Chairs but plaintiff is not being given a new chair because of retaluation of filing grievances and lawsuits against the facility. (see exhibit 1)

Plaintiff already has skin infection, sitting in the toxics that's in the cushion inside, only exacerbates the infection.

## Using Prisoners To Provide Self Care

Plaintiff is being subjected to abuse by other prisoners under instructions off staff. (see exhibit#1 and 4)

# Dental Care

Dixon Facility does not have an ADA dental chair or ADA dental X Ray machine. Plaintiff has been in Dixon facility since September 6, 2019, with broken tooths, known decaying and cavities, and sharp pen hanging/sticking down out his front tooth. Dixon Facility refused to provide dental care based solely on plaintiff's disabilities and refused to accommodate. It wasn't until the filing of this law suit and service on defendant, were dental service attempted to take actions in August 2021. Staff was unable to properly secure plaintiff in the normal dental chair but tried to hold plaintiff in place while the dentist performed oral care, the dentist was able to remove the sharp pen and do two fillins but unable to fix cavity and decaying all the way because the dentist couldn't get in the right position due to tight space and staff struggling to hold plaintiff in place. Plaintiff has not recieved an X-ray and has an infection in his tooth and gum from the lastest inadequate dental care. Plaintiff can not eat, has pain in his gum and tooth, has migrane from cavity and infection. Plaintiff is at risk of full gum infection and losing all his teeth. (See Exhibit #)

# Mental Health

Plaintiff is at risk of his Mental Health state of mind exacerbating due to not being able to socialize with his peers and have groups and day rooms with his peers. Plaintiff's Mental Health Treatment plan includes "Groups" two times a week (see exhibit #3) plaintiff has not been offered groups with peers since being at Dixon Facility based solely on his disabilty. All other Mentally ill prisoners are offered groups with their peers. Due to the lack of socialization plaintiff has attempted suicide numberous times. Mental Health staff has expressed to Dixon Staff the high risk and danger of plaintiff commiting suicide (see exhibit # 123

Plaintiff is being denied out of cell unstructured time as required by Administrative/Institutional Directives and plaintiff's Mental Health's treatment plan, leaving plaintiff in isolation. This isolation is exacerbating plaintiff's Mental illnesses and putting him at high risk self harm and suicide (see exhibit 123)

# Occupational Therapy

The facility doesn't have on site Occupational therapy and relies on Outside Hospitals. Plaintiff has the ability to be more independent with his self care as far as eating, bathing, writting, putting on condom cather and clean himself after bowels move. However, plaintiff is being denied occupational therapy. The Defendants/IDOC officials refuse to make any accommodations despite plaintiff and his attorneys request (see Exhibit #1 and 5 and 6)

# Medical Bed

Dixon Facility old outdated medical beds that has to be cranked by staff in order for the head and mid lower bed to move up and down. The lower leg/feet does not move at all. Not only do medical and security staff not do there routine rounds but when they do do their rounds they do not want to deal with physically cranking the bed because it's an work out for them which leaves plaintiff laying in the bed in one position. Plaintiff requested an automatic bed, with a remote or were buttons are available for plaintiff can adjust the bed himself. Being stuck in one position for to long causes plaintiff severe pain to his fragile body and has plaintiff at high risk of bed sores (see exhibit #1)

## Outside Self Care While At Court and Hospital

Plaintiff is being denied self care assistance when he is outside the facility at the Hospital and Court writs. Plaintiff is forced to sit in his own feces and urine while suffering injuries at the same time. Being under such conditions disturbs the Court proceedings and hinders plaintiff's ability to participate in representing himself or assisting his attorney or at Hospitals. (see exhibits 1, and 5)

The 4th District Appellate Court of Illinois has pointed out the disturbing condition that plaintiff had to endure during trial (see exhibit # 1 and 8)

The IDOC continues to send plaintiff to Court without self care assistance

## Law Library

Plaintiff has over fifthteen pending cases (criminal, Parental and Civil), all prisoners at the facility have access to the law library to conduct online research and review any and all law. However, Plaintiff is being denied the same access and the facility is failing to make reasonable accommodations. This is causing plaintiff not being able to properly litigate his cases (cases that's civil suits concerning Irreparable harm, Parental rights and exoneration in his criminal case).

Plaintiff has only one usable hand (which is limited due to nerve damage and surgery) and can not write without assistance and needs to use a typewritter (which is were they are available at the law library), the facility refuse to assign an aid (Inmate Assistant) to aid plaintiff with writting and handling over ten legal boxes. (see exhibit #1)

## Range Of Motion

Plaintiff was ordered Range Of Motion daily by Dixon Facility's physical Therapist back in November 2019. Nurses and Nurse Assistants have refused to conduct the Range Of Motion. It wasn't until after the filing of this lawsuit when issue of Range Of Motion was enforced by the physical therapist in June 2021, with specific instructions on how to perform Range Of Motions on Plaintiff. Despite this order, CNA "Cecelia Grossman" and CNA "Marley Moreland" refused to personally do the daily ROM and influence other CNA's not to perform ROM on Plaintiff. Plaintiff is at high risk of getting contractors (see Exhibit #1)

## Air Matress

Plaintiff has been laying on his back since 2019 and is in need of an air matress but has been denied that even though medical staff is aware that Plaintiff is at high risk of bed sores. Plaintiff muscles has already broken down and is extreme pain and is at extreme high risk of bed sores

## Emergency Call Button

Every cell in the infirmary has emergency call buttons for emergencys, however the call buttons does not work or disconnected; Plaintiff needs an emergen on one side of the infirmary or the side that Mentally ill prisoners are asigned at.

Staff does not do routine rounds and plaintiff will need emergency medical attention but has no way contact or get the attention of staff as the other offenders has by using their emergency call button

## Monoriting Plaintiff's Self Care Treatment

There's a problem on the health care unit were routine rounds are not being made by security and medical staff. Certain nurse assistants (Cecelia Grossman, Harley Mordand and unknown CNA) are not providing plaintiff assistance at all but documenting that they are or that plaintiff is refusing. There is no way to verify wheather or not these staff are doing there job or not because there's no cameras on the infirmary. Plaintiff has reported these staffs conduct and also his attorneys, investigators has investigated these matters and admitted that camera's should be put on the infirmary as it is on every other parts of the facility. Dixon Facility has hand cameras and use to monitor all movement or care that was offered to plaintiff back on 2019, but it stopped after a couple weeks. Plaintiff has requested for cameras to be placed on the infirmary hallways and dayroom and to use the hand camera to monitor all self care assistance and routine rounds by these staff but nothing has been done and the violations continues on. Plaintiff is not getting his basic needs met by these staff, such as water, food, being cleaned of waste, being left on bed or geri chair for days on. (See Exhibit # 1 and 7)

# Standard Of Review

. When considering a motion for a preliminary Injunction, the court weighs four factors: "(1) The plaintiff's likelihood of success on the merits; (2) The potential for Irreparable harm In the absence of an Injunction; (3) Whether Issuing an Injunction will burden the defendants less than denying an Injunction would burden plaintiff; and = the effect, If any, on the public Interest." Jean v. Massachussetts State Police, 492 F.3d 24, 26-27 (1st Cir. 2007). See also Reaves v. DOC 195 F. Supp. 3d 383 (2016).

. Plaintiff will produce evidence (through witnesses and medical/mental health/grievances and other records) to satisfy all four factor for preliminary Injunctive Relief to be granted In his favor.

# Conclusion

Plaintiff request that this Court grant his motion for temporary restraing order and for prelimanary injunction and order that plaintiff be provide with the relief of:

1. Self Care outside the Facility;
2. To hire more Nursing staff and security staff;
3. Order new updated suitable Hoyer lift;
4. Order new automatic Geri chair;
5. Outside Dental Care;
6. New automatic remote Medical Bed;
7. Out of cell time as required by aDOC's policies and plaintiff's Mental Health Treatment Plan;
8. Access to the law library at least twice a week;
9. Medical emergency call buttons in cells;
10. Discontinue the practice of other prisoners proving self care and operating geri chair to plaintiff and other self care inmates;
11. ADA tooth brush;
12. Television and radio with speakers and remote controls;
13. Tablet with speaker and cords to connect to radio;
14. Accommodations to exercise religious;
15. Occupational therapy;
16. Daily socialization with peers;
17. Visitations in the infirmary with family and friends;
18. Mental Health group with peers;
19. Daily Dental floss and mouthly tooth cleaned;
20. Range of motion twice a day;
21. For cameras to be placed in the infirmary dayrooms and hallways and for recordings of any self care offered to plaintiff;
22. For nurses/CNA's/security staff to conduct thirthy (30) minute welfare checks;
23. Access to go to chapel, school, commissary;
24. Access to typewritter and hotpot.

25. FOR MEDICAL STAFF TO ASSIST PLAINTIFF IN CARING FOR HIS HAIR, NAILS AND OTHER THINGS THAT HE NEEDS ASSISTANCE WITH IN KEEPING HIS APPEARANCE UP TO PART;

26. FOR A PRISONER AID TO BE ASSIGNED TO PERSONALLY AID PLAINTIFF WITH WRITTING/TYPING AND HANDLING LEGAL BOXES;

27. FOR A HIGH LEVEL OF MENTAL HEALTH CARE TO HELP REDUCE SELF HARM AND SUICIDE;

28. TO CREATE A DAILY SELF CARE SCHEDULE FOR PLAINTIFF;

29. PLAINTIFF REQUEST THAT THIS COURT SET A HEARING DATE FOR PRELIMARY INJUNCTION SO HE CAN PRODUCE WITNESS AND EVIDENCE TO SUPPORT HIS NEED FOR PRELIMANARY INJUNCTION AND TEMPORARY RESTRAINING ORDER.

RESPECTFULLY SUBMITTED,

/S/

ERIC E. BERNARD
#R25398
DIXON CORRECTIONAL CENTER
2600 N. BRINTON AVE.
DIXON, IL 61021

EXHIBIT #1

STATE OF ILLINOIS )

)

COUNTY OF Lee )

**AFFIDAVIT**

I Erice. Bernard BEING FIRST DULY SWORN UNDER OATH DEPOSE AND STATE THAT THE FOREGOING IS TRUE AND CORRECT AND MADE UPON MY PERSONAL KNOWLEDGE...........

That i have been housed in the Dixon correctional facility ~~seree~~ Infirmary since 9-6-2019. I had a stroke and brain infection back in March 2019 and it left me unable to walk, talk, sit up, I have right side body weakness, left leg weakness and nerve damage in my left arm. My medical diagnoses are: "Reversible Cerebr Vasoconstriction syndrome; Vasculitis; Cer Vasular Accident and Cad

I've improved a little, i can only (limited) use my left hand/arm/fingers it's hard for me pick things (heavy things) up or grip things, I need assistance eating, bathing, clothed, writting drinking water and help with every thing, I wear adult diapers, i cant control my bladder + or bowels and cant change myself or clean my self.

I hear voices, i see things, i have flashbacks and black outs, i self harm to the extreme and im suicidal. I often think of killing myself. My Mental Health Diagnoses are: Schizoaffective Bi Polar type; Post traumatic stress Disorder; Borderline personality and Anti personality Disorder.

Since being here at Dixon facility Infirmary i have been isolated with no socialization with my peers, im confined in my cell 24/7 majority of the time, i have no cellmate, im all alone.

I am confined to the bed and Geri chair, ~~Because~~ i need being transported in the Geri Chair. The Geri Chairs

SUBSRIBE AND SWORN TO BEFORE ME

THIS 28 DAY Oct 2021

_____

NOTORY PUBLIC

BRYAN CAMPBELL
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
April 21, 2025

affiant

are hard to steer, the wheels are not functionable; the interior is exposed, urine, feces vomit, old food and mace is soaked in the interior and it smells awful and it's been like this for over two years. The Geri Chair has never been cleaned nor have i gotten a new Geri Chair.

For the past two years officers and nurses and CNA's have been leaving me sitting in my feces, urine, vomit and old food and mace for day and weeks. I have skin infection, fungus, rashes

I am being denied law library access as the other prisoners, to conduct research, review law books, use the type writter making it impossible to litigate my pro se cases. I only have one mobile hand and that hand has nerve damage and locks up making it difficult to use it.

I'm being denied religious service and access to the chapel to meditate. Due to not being able to sit up straight, its not safe for me to wear a religious necklace as allowed by the prison, i requested an accommodation to have a religious bracelet and ring but was denied.

The Geri chair that I'm in has sharp metal and strews exposed and cuts me and pokes my body.

The times that i do get baths, the CNA's do not wash my entire body just my back, they were trained to not wash entire body by CNA Cecelia Grossman.

The current Hoyer lift at the facility, is not suitable for me or a person who has contractors.

The times that im placed in the medical bed, i will be left there for extended periods of times just laying there. My body hurting, staff do not do regular rounds, the bed needs to be hand cranked by someone. I can't use headphones, or ear buds and im able to operate my tv.

BRYAN CAMPBELL
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
April 21, 2025

subscribed and sworn before me
on
10/28/21
notary

affiant

2 of 4

Nurses, CNA's and security staff try to force prisoner workers to pick me up out the bed then into the geri chair and try to force the workers to put me in the bathtub and order that the workers do it or they will be fired. The workers also are ordered to change my adult diaper brief, touch clean my body parts or they will be fired, most workers refuse to do it but some do. I have be violated by worker "Richard Milian" who under orders of CNA (Mrs. Russell, Ms. Felder, Ms. Barlow, Ms. Jackley, Mrs. Grossman and Ms. Moreland) and nurse Helferfinger, Sgt. Micheal Meader — "Richard" will come in my cell and cell and change my diaper and wip my rear and penis area, while at the same time stroking my penis and rubbing his fingers between my rear end, i tried to fight him off but i was to weak and keep telling him to stop, i dont want him touching me at all, the above named staff will be aware of this including "officer cassidy" and "officer Miller" will be watching. I reported this information to my attorney "Amanda Antholt" and she addressed it with the IDOC then i wrote grievances about it, it was an investigation and supervisors ordered that no inmates are allowed to touch me or assist me at all and that Medical staff ONLY can provide aid/assistance to me. However, these acts continued by "Milian" and other workers, it's not ~~just~~ me who is being treated like this, it's every offender in this infirmary. This has been going on since i been here and is still going on now. Im in a situation were if i dont allow the workers to do things (assistance) for me then im not going to get any assistance at all... The only time the CNA's or nurses assist me or provide any self care is when certain supervisors come to the unit but this rarely happens.

BRYAN CAMPBELL
OFFICIAL SEAL
Notary Public · State of Illinois
My Commission Expires
April 21, 2025

Subscribed and sworn before me
on ___10/28/21___ 2021

_____
Notary

_____
affiant

3 of 4

I've been dropped by the workers countless or times, busting my head, lip and dropped on my neck when they tried to pick me up. The workers are authorized to use the Hoyer lift and Geri Chair, which i was dropped out of as well.

Some CNA's do there job and use the hoyer lift but the hoyer lift is outdated and is not designed for a person like me. My body is stiffed in the laying position, i cant sit in a 90° angle. The Hoyer lift is designed for people who are mobile and flextable. Every time im placed in the hoyer lift, it forces my body to fold up were my knee's is towards my face, my bones will be popping and shaking, trying to force it's self back in the laying position, causing sharp pain through out the body (which results in acute injuries and medical staff refuse to treat me for the injury and medicine for the pain) this interfers with my daily activicties.

The Geri Chair that im in now, is old/broken down, the cover on the cushion is torn, the cushion is exposed, the cushion is soaked with urine, feces, vomit, old food, milks and juices, strews and sharp metal is piercing through the cushion which pokes and cuts my body, the Medical Administrator and ADA coordinator refuse to order a new one.

I do not have an emergency call button to get the nurse/CNA attention; I do not have a bed with an remote control (automatic); I wear diapers and they are not changed daily; im not getting proper Dental Care because there's no portable X-Ray machine and ADA Dental chairs (I have decaying exposed nerves, it hurts and that interfering with me drinking and eating); CNA and nures do not assist me with applying medicated cream and fongus cream to the infect area on my rear and groin area (which is worsening the condition)

Im being denied self care assistance while at court and visits to the Hospital. The urine and feces eats at the fungus and open sores, it burns and is extremely painful. I cant participate in the court proceedings and interfers with everything

BRYAN CAMPBELL
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
April 21, 2025

subscribed and sworn before me

on ___10/28/21___      2021

_____
affiant

_____
Notary

4 of 4

EXHIBIT # 2 

☐ Completed Suicide          ☒ Serious Suicide/ Self-Injurious Attempt

Offender Name: Bernard, Eric

Date of Birth: 8/11/1982          Age: 34          Date of Death: _____          ID#: R25398

Gender:  ☒ Male     ☐ Female     ☐ Transgender     ☐ Other (Identify): _____     ☒ N/A

Race (Check one):          ☒ African American     ☐ American Indian  ☐ Asian     ☐ Caucasian
            ☐ Hispanic     ☐ Other (Identify): _____

Designated SMI: ☒ Yes     ☐ No     Designated Level of Care (Identify): RTU

---

## Section I  Event Information

A.  Date of Event: 3/3/17          Time of Event: 2:05 PM          Facility: Pontiac Mental Health

B.  Location, include housing type/location (GP, crisis, seg, yard, etc.): SMH 203

C.  Method: cutting

D.  Predictors of Suicidal Action: history of multiple suicide attempts and SIB, poor distress tolerance, poor emotional regulation, poor impulse control/judgement, lack of coping skills, upcoming court date, young age and long sentence.

E.  Was there a suicide note? ☐ Yes  ☒ No   If yes, please include a copy of the note as an attachment and summarize it in this section.

F.  Other relevant information:

---

## Section II:  Background

A.  Education (Check Highest Grade Level Completed):

☐ < 8th   ☐ 8th   ☐ 9th   ☐ 10th   ☒ 11th   ☐ High School Diploma   ☐ High School Equivalency   ☐ Some College   ☐ College Degree   ☐ Advanced College

B.  Marital Status (Check one):

☒ Single   ☐ Married   ☐ Divorced   ☐ Separated   ☐ Widowed   ☐ Other   (Identify): _____

C.  Occupational History: None

D.  Military History: None

E.  Current Incarceration:

Offense: Armed Robbery with a Firearm

Length of Sentence: 55 years

MSR: 10/21/2037          Time Served: 7 years

Number of Previous Incarcerations: 3          Discharge Date: 10/21/2040

What were the offender's feelings regarding his or her sentence and the length of said sentence? Offender reports having a long sentence and shares feelings of anxiety regarding going to court. Offender reports having "flashbacks" of spending time isolated at DeKalb County Jail when going to court. He recently reported that he has nothing to live for due to fighting with his girlfriend and having limited contact with his son.

F.  History of Self Inflicted Harm or Suicidal Ideation: The offender reports a long history of significant suicide attempts. His self-report is that his first attempt was at the age of 11, when he tried to shoot himself in the head with a gun which misfired. A review of the records indicate that the offender previously had reported his first attempt to occur at the age of 8. Offender estimates having 17 suicide attempts by shooting, cutting, or overdosing but has also engaged in self injury without the intent to die on a number of occasions. Offender Bernard reports that going to court is a trigger for his self-injury and suicidal ideation and "the only way I know how to get through it is by going to the other side". Offender

also has staples inserted in his wrist from previous self-injury which need to be surgically removed. In addition, offender Bernard also had cut himself at the same time that two other high-risk offenders engaged in significant self-injury in what appeared to be an orchestrated event. The other two offenders were sent to an outside hospital due to the severity of their injuries and received testing and monitoring of their hemoglobin. Offender Bernard had made it known to mental health staff that he felt his hemoglobin should have also been checked and threatened to file a complaint.

On March 3 2017 at approximately 2:05 PM, Lt. Sorenson was conducting a tour of SMH gallery 2 and observed Offender Bernard in cell 203 lying on the floor with blood on the back of his jumpsuit, unresponsive. Lt. Sorenson contacted Major Hadsell who responded in person and called a Code 3. Offender Bernard was placed in mechanical restraints and checked for responsiveness and it was determined that he was breathing as evidenced by opening and closing of his mouth. Lt. Sorenson also noticed a tourniquet made from torn bed sheets on the upper right arm of the offender. The offender was placed on a back board and C/O Martin and Sgt. Dyer carried the offender to the Emergency Response Vehicle when Nurse Drilling and Nurse Fox arrived for transport to the Health Care Unit Urgent Care. The offender was evaluated by Dr. Tilden and was subsequently sent to St. James Hospital. Nurse Boggess removed a tourniquet from the offender's right arm and noticed that the offender had opened up an old wound in the AC area of the elbow. Hemoglobin levels check at St. James Hospital was 7.5 and the offender received one unit of blood.

G. **Release Plans:** Offender is due to be released in 2037. He does not have any immediate plans for release, but his restrictive housing outdate is 4/9/2017.

## Section III: Personality and Mental Health

Provide a narrative account for each of the following:

A. **Current & Historical Mental Health Diagnoses** (specify DX of Psychiatrist & MHP): Offender reports first receiving mental health treatment at the age of 12, when he received residential treatment at a facility in Utah for approximately 6 months. The offender reports that when he is not incarcerated he generally refuses treatment. Records indicate a psychiatric hospitalization at Hartgrove hospital as well. Records also indicate a history of poor impulse control and auditory hallucinations since childhood. The offender's previous diagnoses include Posttraumatic Stress Disorder, Substance abuse by history, and Rule Out Bipolar Disorder. His most recent psychiatric diagnosis as of 3/9/2017 is Persistent Depressive Disorder and Borderline Personality Disorder, while his current MHP diagnosis is Schizoaffective Disorder Bipolar Type and PTSD.

B. **Physical Status – Functioning** (i.e., chronic conditions, acute issues, pending Dx, etc.): Offender denies any medical conditions at this time, but is known to have a chronically low hemoglobin level which has fallen to as low as 7.4 as a result of excessive self-injury. Currently, it is at 10.0. Offender Bernard also has a history of non-compliance with iron supplements to improve his hemoglobin.

C. **Social Status – Functioning** (i.e., social Hx, current social situation, etc.): Offender was raised by both biological parents until his mother's death when he was 8 years old. Offender was then brought to the custody of his maternal grandmother. Offender has had good relationships with both parents but reports witnessing his father shoot and kill his mother. The offender has three sisters and four brothers on his mother's side, and a sister and brother on his father's side. Offender Bernard reports that his maternal siblings blamed him for their mother's death and his brother on his mother's side killed his the offender's father. Offender Bernard reported very minimal contact with his siblings currently but states that he does have social support from his girlfriend and son.

D. **Mental Health Status – Functioning:** Offender Bernard is currently receiving mental health treatment consistent with an RTU level of care. He struggles with chronic feelings of anxiety and frequently reports hearing the voice of his father. He also reports a fear of being isolated from others and alleges having been isolated while in county jail. Offender Bernard reports other hallucinations such as "flashes; hearing souls die in hell calling for help". He has a recent history of serious suicide attempts. In January 2017 he cut his arm while in court, and in February 2017 he injested multiple pills and was sent to an outside hospital. His most recent attempt, which was near-fatal, occurred on 3/3/2017 when he cut his right anterior cerebral artery. Offender Bernard is currently offered regular individual and group therapy when he is not on crisis watch. He sees psychiatry regularly as well and reports being compliant with his medications which include Lorazepam 2mg PRN; Benadryl 50mg; Haloperidol 5mg BID; and Paxil 20mg.

E. **History of Drug or Alcohol Abuse:** Records indicate a history of cannabis and alcohol abuse, beginning at the age of 10 or

*Printed on Recycled Paper*

Distribution:     Offender Medical File

11. Offender does have a history of three disciplinary reports for making homemade alcohol. Offender has never participated in substance abuse treatment.

**F.   History of Assaultive Behavior:** Offender Bernard has a history of spitting on staff (9/19/16), licking a nurse's finger (11/23/16), and assaulting another offender during a fight (8/4/15).

**G.   Disciplinary History:** Offender Bernard has a disciplinary history involving drugs and drug paraphernalia, damage or misuse of property, impairment of surveillance, disobeying direct orders, contraband/unauthorized property, dangerous written materials, intimidation or threats, forgery, concealment of identity, impeding or interfering with an investigation, assaulting any person, and failure to report. His most recent infraction was 11/23/2016 when he licked a nurse's finger in a wagging manner.

## Section IV:   Antecedent Circumstances

**A.   Identifiable Stressors:** Offender is currently in disciplinary restrictive housing. He also reports difficulty with attending court dates due to flashbacks and anxiety. He is young in age and facing a long sentence. Offender Bernard also has a lack of social support and reports continued relationship problems and being unable to see his son.

**B.   Significant Losses:** Offender reports the homicides of both parents three weeks apart when he was 8 years old. He reports his grandmother died in 2010. The offender also related that he and his girlfriend had recently been having relationship difficulty but reports it has been resolved. He also reported the death of his grandfather in June 2016.

**C.   Family History of Suicide:** In 2003, Offender Bernard's cousin shot and killed himself.

**D.   History of Psychiatric Hospitalizations:** Records suggest a history of psychiatric hospitalization at Michael Reese, Streamwood, and Lake Shore Hospitals.

**E.   Staff Opinions:** Nurse Jade Drilling reported that a tourniquet was found on Offender Bernard's arm and that there was evidence of his blood having been diluted. She estimated the offender to have lost approximately 1 liter of blood during the most recent event on March 3 2017.

Offender Bernard does exhibit symptoms of both Antisocial and Borderline personality disorders. He appears to seek the attention of multiple staff by telling of his traumatic past with various staff members despite being advised that this may be more harmful to him psychologically and that he ideally should address such issues with his primary therapist, as he is not stable enough to repeatedly discuss his trauma. In congruence with such characterological conditions, Offender Bernard has demonstrated very poor insight and judgment. The offender also appears to be escalating in his self-injurious behavior possibly in an attempt to dictate pace of treatment and to engage with additional staff. For example, his most recent attempt occurred while a federal court monitor was present on the gallery. There appears to be secondary gains of increased staff interaction, increased level of care, as well as threats of litigation which may be contributing to Offender Bernard's behavior.

**F.   Offender Opinions:** Offender Bernard offered that "I don't think I'm getting treated at all" for his mental illness and "If I'm gonna do something they're gonna find me on the floor". The offender has voiced his concern that he is not getting enough mental health treatment and has threatened litigation to this effect.

**G.   Last person to have contact with the offender:** C/O Klus conducted a watch check at 2:00 PM. At 2:05 PM Lt. Sorenson found the offender lying on on the floor of his cell in blood.

**H.   Last staff person to have contact with the offender:** C/O Klus conducted a watch check at 2:00 PM. At 2:05 PM Lt. Sorenson found the offender lying on the floor of his cell in blood.

## Section V: Conclusion and Recommendation

Offender Bernard presents with a history of serious and near fatal self-injurious behavior. His traumatic past continues to contribute to his psychological symptoms of self-injury, poor distress tolerance, and limited insight. Mr. Bernard has had episodes of improvement in symptoms with appropriate medication monitoring and psychotherapy as well as environmental structure, but tends to become overwhelmed when facing a court date. Therefore, the following recommendations are suggested:

Offender Bernard should continue to receive treatment with a multidisciplinary approach involving medical, security, and mental health staff in his care. Medical staff should be consulted when assessing Offender Bernard's watch status to reduce the risk of fatal

Distribution:     Offender Medical File
                  Office of Mental Health Management
                  Transfer Coordinator (if applicable)

Printed on Recycled Paper

DOC 0375 (Rev. 11/2017)

blood loss should self-injury occur.

Once off of crisis watch, it is recommended that Offender Bernard continue to receive both individual and group psychotherapy to address healthy coping skills, distress tolerance, and interpersonal skills.

Regular psychiatric visits for medication adjustment and monitoring are imperative to establishing mood stability and reduce symptoms of hallucinations.

Mental health, medical, administrative, and security staff should staff Offender Bernard's care weekly to address forseeable triggers and contributory factors to his psychological symptoms and behaviors to reduce the risk of serious self-harm

## Section VI: Resource List

A.   List all documents examined for this review: Medical chart (Mental health progress notes, medical progress notes) Offender 360, Incident Reports, Inmate/Staff Interviews, CHAMP disciplinary card

B.   List all persons (staff and offenders) interviewed for this review: Eric Bernard R25398
Jade Drilling, RN

## Section VII: Signature

Prepared by:

Title: Licensed Clinical Psychologist

Print Name: Kelly Renzi, PsyD

Signature: _____     Date: 4/14/17

Offender Medical File

EXHIBIT #3

RTY
infumes

# ILLINOIS DEPARTMENT OF CORRECTIONS
## Mental Health Master Treatment Plan Update

Facility | Dixon Correctional Center

Name of Individual in Custody: BERNARD, ERIC    ID#: R25398    DOB: 8/11/1982

Treatment Plan Date: 4/13/21

Treatment Type: ☐ Crisis Watch Entry/7 days Seg Entry    ☐ Routine Crisis Watch    ☐ Crisis Watch upon discharge

Next Treatment Plan Due: ☐ Annually (OP)    ☐ Every 6 months (SDP)    ☒ Every 2 months (RTU)
☐ Monthly (SEG)    ☐ Weekly (Input, Crisis)    Next Treatment Plan Due: 11/13/21

**Diagnosis Change?**    ☒ No    ☐ Yes
If yes, please add diagnosis and justification in the boxes below.

Diagnosis added or deleted:

301.83 Borderline Personality Disorder (Primary)
301.7 Antisocial Personality Disorder (Primary)

309.81 Post-traumatic Stress Disorder (secondary)

Justification for change:

| Medication(s): | Dose: | Frequency: | Indication: |
|---|---|---|---|
| none currently | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Add Medication

# Mental Health Master Treatment Plan Update

Facility | Dixon Correctional Center

Name of Individual in Custody: BERNARD, ERIC | ID#: R25398 | DOB: 8/11/1982

**Response to medication and other concurrent treatment:** (Comment on enforced meds, compliance issues, lab follow-ups, etc.)

Mr. Bernard remains non-complaint with treatment, while also obtaining IDR's. He is not currently prescribed any psychotrophic medication (see chart).

**Client long-term goals:** (use client direct quote)

6/4/21-"I want to get back at everyone."
8/3/21- Resident refused to review treatment plan with QMHP

9/13/21 reviewed treatment plan, refused to sign, did not further engage with QM

**Short-term Objectives:** (Must be specific, measurable, attainable within review period, realistic and time-bound)

| Objective number: | Objective (Linked to documented functional impairment, symptoms & diagnosis): |
|---|---|
| 1 | Mr. Bernard has ongoing diagnoses of Borderline and Antisocial Personality Disorders, and Post Traumatic Stress Disorder. As a result, he demonstrates anxiety, anger, paranoia, and a history of self-harm behaviors. He will become engaged in treatment programming and gain insight and awareness into his maladaptive behaviors and symptoms. In this process, he will also acknowledge his need for effective coping.<br>This includes compliance with medical interventions, as implemented by healthcare staff. |

**Clinical Interventions** (Description, duration and staff responsible):

Psychoeducational group up to 2x weekly with Ms. Woods/Ms. Fischer (BHTs) and other available mental health staff to learn coping skills to help improve emotion regulation and ability to tolerate distress. Unstructured out of cell time, up to 10 hrs/week when not on crisis watch. Retrictive housin placement due to IDRs may impact out of cell time. Treatment planning/monthly follow up every 3 weeks with Ms. Watson (QMHP) to discuss progress towards treatment. Psychiatric follow up monthly with Dr. Susjnar should medication management be reconsidered.

Client initials:

reviewed but refused to sign

**Involvement** (Client agrees to participate by):

Mr. Bernard will manage his distress more effectively, and eliminate harm to self/others. He will learn and practice at least two coping skills per day, and will attend at least 80% of treatment programming; 100% if medication is prescribed. He will also call for crisis if he has thoughts of self-harm or intent to harm others prior to participating in either of these behaviors. Mr. Bernard will participate in unstructured out of cell time (day room) to reduce isolation for up to 10 hours/week (based on operational availability, and RH/Crisis status). He will also cooperate with medical interventions, as indicated, and will effectively communicate with staff should he have any concerns regarding treatment.

# Mental Health Master Treatment Plan Update

Facility | Dixon Correctional Center

Name of Individual in Custody: BERNARD, ERIC    ID#: R25398    DOB: 8/11/1982

## Short-term Objectives: (Must be specific, measurable, attainable within review period, realistic and time-bound)

**Objective number:**

2

**Client initials:**

*Review
but
refuse
to sign*

**Objective (Linked to documented functional impairment, symptoms & diagnosis):**

Mr. Bernard has engaged in harmful behavior toward himself and others. This includes starting fires in his cell. He will work toward improving his degree of stability by appropriately communicating his concerns to staff, versus resorting to harm to self or others in order to seek attention. In addition, he will continue his willingness to accept both mental health and medical treatment in order to improve his ability to cope with the ongoing symptoms of anxiety, anger, and harmful thoughts.

**Clinical Interventions (Description, duration and staff responsible):**

Psychoeducational groups up to twice weekly with Ms. Woods/Ms. Fisher (BHT) and available BHT to learn coping skills to help improve emotion regulation and his ability to tolerate distress and better manage crisis situations. Treatment planning/monthly follow up every 3 weeks with Ms. Watson (QMHP) to discuss progress towards treatment. Psychiatric follow up monthly with Dr. Susjnar, as indicated. Daily medical intervention(s) as needed by HCU staff.

**Involvement (Client agrees to participate by):**

Mr. Bernard will learn and practice at least two coping skills per day.
Mr. Bernard will attend at least 80% of treatment programming.
Mr. Bernard will call for crisis and learn to appropriately address any harmful thoughts or suicidal ideation, prior to inflicting harm upon himself or others.
Mr. Bernard will cooperate with HCU nurses and physicians in order to receive appropriate care to address his medical needs.

# Mental Health Master Treatment Plan Update

Facility | Dixon Correctional Center

Name of Individual in Custody: BERNARD, ERIC  ID#: R25398  DOB: 8/11/1982

## Short-term Objectives: (Must be specific, measurable, attainable within review period, realistic and time-bound)

**Objective number:** 3

**Client initials:** *[handwritten, illegible — "Returned but refused to sign"]*

**Objective (Linked to documented functional impairment, symptoms & diagnosis):**

Mr. Bernard has obtained IDR's which have resulted in Restrictive Housing Placement. This consists of Arson (3/27/2021 and 4/21/2021), Dangerous Contraband, and Damage or Misuse of Property. His anger, anxiety, and impulsivity have likely played a role in obtaining these IDR's.

**Clinical Interventions (Description, duration and staff responsible):**

Mr. Bernard will work effectively with mental health and security staff to resolve issues and concerns prior to acting on his anger and anxiety, in order to reduce the occurrence of IDR's. He will also cooperate with Dr. Susnjar, Ms. Watson, and other MH staff when addressing related behaviors during group or follow-up time (up to 2 hours/week, 1 hour every three weeks when not on crisis watch).

**Involvement (Client agrees to participate by):**

Mr. Bernard will demonstrate overall improvement in ability to cope with anger, anxiety, and impulsivity as evidenced by no further IDR's within the next 30 days.

| | | |
|---|---|---|
| Primary QMHP (Print): A. Watson, LCSW/QMHP | Signature: *A. Watson* | Date: 9/13/21 |
| Psychiatric Provider (Print): M. Susnjar MD | Signature: *[signature]* | Date: 9-22-21 |
| Title: | Print & Sign: | Date: |
| Title: | Print & Sign: | Date: |
| Title: | Print & Sign: | Date: |
| Title: | Print & Sign: | Date: |

☐ I agree with this treatment plan    ☐ I do not agree with this treatment plan

Client Signature: *Returned to sign*    Date: 9/13/21

EXHIBIT #4



## Advancing the human and civil rights of people with disabilities
SELF-ADVOCACY ASSISTANCE ★ LEGAL SERVICES ★ DISABILITY RIGHTS EDUCATION ★ PUBLIC POLICY ADVOCACY ★ ABUSE INVESTIGATIONS

November 18, 2019

**_Confidential Legal Communication_**
Eric Bernard
#R25398
Dixon Correctional Center
2600 N. Brinton Ave.
Dixon, IL 61021

*Re:* EFE Matter Nos. 2019-0962 (new) and 2019-4139 (closure)

Dear Mr. Bernard:

I am sorry for the delay in writing to you after our phone call on October 28th. During that call, we discussed the events that occurred at Dixon in September; your treatment at Schwab; and your treatment since returning to Dixon. I also received your letter dated October 31, 2019.

As you know, I had previously opened a file for you (what our office calls "matters") with the goal of addressing your conditions at Stateville and to get you back to Schwab for rehabilitative care. I am now closing that matter out.

I am opening a new matter regarding your concern regarding some inappropriate use of the inmate aides in your health care, particularly as to bathing and in transfers (for which they do not appear to be properly trained). We are raising these issues with the Illinois Department of Corrections, and also the Court Monitor appointed in the *Lippert* class action (overseeing reforms to the medical treatment system).

I am not sure if you are already familiar with *Lippert v. Baldwin*. Similar to Rasho, *Lippert* is a class action case that seeks to injunctive relief (not for individual relief or monetary damages) over the medical treatment system in IDOC. A consent decree was recently reached in that case, and an independent monitor has been appointed to oversee reforms. The plaintiffs' attorneys (for prisoners with medical needs) are: Uptown People's Law Center, 4413 North Sheridan Road, Chicago, IL 60640, and the ACLU of Illinois, 180 N Michigan Ave # 2300, Chicago, IL 60601.

As you know, we cannot offer you representation in any individual damages cases that you may want to bring regarding all of these events. This is because we have limited resources and have to focus our work on the class actions. I am returning the complaint that you sent to you. I am sending a list of civil rights attorneys who may be willing to consider your case.

*The Independent, federally mandated Protection & Advocacy System for the state of Illinois*

John K. Holton, Ph.D., Board Chairperson    Zena Naiditch, President & CEO

MAIN OFFICE: 20 N. Michigan Avenue, Suite 300 ★ Chicago, IL 60602 ★ Email: contactus@equipforequality.org ★ Tel: (312) 341-0022

Toll Free: (800) 537-2632 ★ TTY: (800) 610-2779 ★ Fax: (312) 541-7544 ★ Multiple Language services

**WWW.EQUIPFOREQUALITY.ORG**

EXHIBIT #5



# Advancing the human and civil rights of people with disabilities

SELF-ADVOCACY ASSISTANCE ★ LEGAL SERVICES ★ DISABILITY RIGHTS EDUCATION ★ PUBLIC POLICY ADVOCACY ★ ABUSE INVESTIGATIONS

October 22, 2020

*Privileged LEGAL Correspondence*
Eric Bernard
# R25398
Dixon M Correctional Center
2600 N. Brinton Ave.
Dixon, IL 61021

   Re: EFE File No. 2020-2900

Dear Mr. Bernard:

I am sorry for the delay in writing to you. I am writing to follow up on our conversation on September 11, 2020, and regarding the ongoing lack of needed assistance for you at Dixon.

Last Spring, after our visit in March right before the COVID lockdowns, I opened a file in our system regarding the concerns with your need for assistance with activities of daily living at Dixon and during your transports for court.

On March 18, I wrote to Warden Nicklaus regarding your accommodation needs, particularly as during court writs. That letter included this explanation and request:

> Mr. Bernard has active litigation in several county courts, including relating to his parental rights in Champaign. This is approximately a 2.5-3 hour drive, one way. Mr. Bernard reports that during these long trips he does not have assistance with toileting and hygiene. On at least one occasion this has caused a disruption in his court hearing and Mr. Bernard, quite understandably, fears that his poor hygiene (due to staying in a diaper for such an extended period of time) is negatively impacting him during court.

> Mr. Bernard's needs could be accommodated in several ways. First, best case scenario would be to provide more intensive physical and occupational therapy focused on building his ability to care for himself independently. Second, and until he is able to do that, appropriate staff must be provided to assist him during lengthy court writs. Third, as an alternative, work with the court to provide for video appearance, if that is something that Mr. Bernard would prefer or agree to.

By this time this letter was sent, they had already switched to video appearances anyway due to COVID-19.

Meanwhile, shortages of staff including the CNAs who you rely on for assistance with ADLs have persisted, as well as the increasing restrictions on the COVID lockdowns. We understand that at times you have been denied the assistance you need to safely transfer and bath, among other things,

*THE INDEPENDENT, FEDERALLY MANDATED PROTECTION & ADVOCACY SYSTEM FOR THE STATE OF ILLINOIS*

MARK P. ROTATORI, BOARD CHAIRPERSON ZENA NAIDITCH, PRESIDENT & CEO

MAIN OFFICE: 20 N. MICHIGAN AVENUE, SUITE 300 ★ CHICAGO, IL 60602 ★ EMAIL: CONTACTUS@EQUIPFOREQUALITY.ORG ★ TEL: (312) 341-0022

TOLL FREE: (800) 537-2632 ★ TTY: (800) 610-2779 ★ FAX: (312) 541-7544 ★ MULTIPLE LANGUAGE SERVICES

**WWW.EQUIPFOREQUALITY.ORG**

EXHIBIT # 6



## Advancing the human and civil rights of people with disabilities

SELF-ADVOCACY ASSISTANCE ★ LEGAL SERVICES ★ DISABILITY RIGHTS EDUCATION ★ PUBLIC POLICY ADVOCACY ★ ABUSE INVESTIGATIONS

October 7, 2021

By First Class Mail:
Warden Justin Wilks
Assistant Warden Andrea Tack
Dixon Correctional Center
2600 N. Brinton Avenue
Dixon, IL 61021

     Re:    Eric Bernard R25398
           EFE File No. 2021-6248

Dear Warden Wilks and Assistant Warden Tack:

I am writing regarding Eric Bernard, who is housed in the healthcare unit with significant physical disability following a stroke and brain infection in 2019. I am writing today about the assistive devices that Mr. Bernard requires and the extremely poor condition of the geri chair recliner that Dixon provides for his use.

As you know, Equip for Equality is the federally mandated Protection and Advocacy (P&A) system for the State of Illinois, charged with protecting the rights of Illinois residents to be free from discrimination based on disability. With respect to facilities that house people with physical disabilities, we have authority under the Protection and Advocacy of Individual Rights (PAIR) program to investigate, including through onsite monitoring and record review; advocate; and bring legal action to readdress the rights of people with physical disabilities within public facilities. Rehabilitation Act, 29 U.S.C. 794(e).

In September, I visited Mr. Bernard in the healthcare unit. Mr. Bernard was in the geri chair recliner, as he has been during previous visits over the last two years. This was striking and concerning for two reasons. First, the chair is in considerable disrepair and needs to be replaced. The fabric is torn up and the mechanics of the interior chair (including screws) are exposed.

Second, the chair keeps him in a reclined position and thus limits any potential gains in his mobility and self-care. It also precludes participation in activities and services that should be available to him. The chair has been useful in allowing him to get him out of bed and to move around his cell and, when allowed out, the unit. However, it is not appropriate as the sole method to allow him mobility for years following his stroke. He needs a mobility device that will encourage continued recovery, maximize his independence, and provide access to the services, programs, and activities available in the facility.

*THE INDEPENDENT, FEDERALLY MANDATED PROTECTION & ADVOCACY SYSTEM FOR THE STATE OF ILLINOIS*

MARK P. ROTATORI, BOARD CHAIRPERSON   ZENA NAIDITCH, PRESIDENT & CEO

MAIN OFFICE: 20 N. MICHIGAN AVENUE, SUITE 300 ★ CHICAGO, IL 60602 ★ EMAIL: CONTACTUS@EQUIPFOREQUALITY.ORG ★ TEL: (312) 341-0022

TOLL FREE: (800) 537-2632 ★ TTY: (800) 610-2779 ★ FAX: (312) 541-7544 ★ MULTIPLE LANGUAGE SERVICES

**WWW.EQUIPFOREQUALITY.ORG**

We understand that staff previously tried unsuccessfully to have Mr. Bernard use a standard wheelchair. These chairs are not fitted for their user and thus do not provide the postural support that Mr. Bernard needs. That the standard wheelchair used in the facility does not work for Mr. Bernard should not mean that the geri chair is the only option, particularly in light of its limitations.

An appropriate and properly-fitted mobility device must be obtained for Mr. Bernard's individualized needs, along with the necessary physical therapy to allow for his progress. We understand that a physical therapist has worked with him, and we appreciate that effort, but without the necessary frequency and quality, the physical therapy will not have results. By quality, we mean the type of intensive therapy for his degree of disability which likely will require additional equipment to allow Mr. Bernard to participate in the physical therapy.

These issues directly impact Mr. Bernard's ability to participate in and benefit in the "programs, services, or activities" otherwise available at Dixon. In this case, that simply refers to basic activities of daily life, such as movement in and out of cell and participation in dayroom showers/bathing, physical therapy and other activities. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952, 1955 (1998). The Americans with Disabilities Act (ADA) and Rehabilitation Act require the facility to take proactive measures through the provision of reasonable modifications to ensure meaningful access to all its programs and services. *Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712 (1985) ("to assure meaningful access, reasonable accommodations in the [] program or benefit may have to be made."). In prisons, where people with disabilities cannot secure their own assistive devices and supports, the facility is required to provide them as reasonable accommodations (or, "modifications" in the statutory language) to allow for their access to the programs, services and activities of the facility. *See, e.g., Jaros v. IDOC*, 684 F.3d 667 (7th Cir. 2012); *Phipps v. Sheriff of Cook County*, 681 F. Supp. 2d 899 (N.D. Ill. 2009).

Here, while several accommodations are being provided—including the geri chair —they are not adequate to provide Mr. Bernard with meaningful access to the programs, services, and activities of the facilities.

The case of *Wright v. New York State Dep't of Corrections*, provides a useful example. In that case, the DOC provided a mobility assistance program for wheelchair users. This program was indeed an accommodation, but it required individuals to utilize only manual wheelchairs and provided access to aides only with advance notice. The court found that this accommodation (the mobility program) failed to prove for *meaningful* access to the programs, services and activities of the prison. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016). For example, the plaintiff was sometimes unable to get to the law library, sickcall, or even the bathroom and, because of need to rely on others for movement out cell, he was deterred from going to yard or recreation.

While it involved different facts, *Wright* makes the point relevant here that the adequacy of the accommodations available must be measured by the access they allow the person with a disability. The geri chair allows for some access – limited movement around his cell and to the dayroom. But, as in *Wright*, it fails when measured against the full scope of movement and participation in activities that would otherwise be available to him. Mr. Bernard is left isolated in

his cell with very limited interaction with other prisoners and limited engagement in even the programs, services, and activities otherwise available in the HCU.

In addition to being denied access to the facility's services, programs, and activities, Mr. Bernard is also being deprived of interaction with non-disabled people. When enacting the ADA, Congress explained that "society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination ... persist[ ] in such critical areas as ... public accommodations ... and access to public services." 42 U.S.C. § 12101(1), (2), (3). The Supreme Court has held that unnecessary segregation (referring to separation from those without disabilities) is unlawful. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600, 119 S.Ct. 2176 (1999). When reasonable accommodations—through the provision of the needed assistive devices for the individual or other methods—can allow for integration, they must be provided. "Integration is fundamental to the purposes of the Americans with Disabilities Act." *Id;* 28 C.F.R. § Pt. 35, App. B.

The Seventh Circuit Court of Appeals has discussed that accommodations must be provided where the "accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001)(quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)). Accommodations that would allow Mr. Bernard to participate in and benefit from the full use of his cell and out-of-cell activities and services are therefore required unless they would "result in a fundamental alteration in the nature of [the] service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3).

We are requesting that you replace the geri chair currently in use and conduct a full assessment of the assistive devices needed to allow Mr. Bernard to more fully participate in programs, services and activities (in and out of cell), benefit from physical therapy, and interact with nondisabled prisoners.

If we can be of assistance in finding resources or in any way, please do not hesitate to reach out. Thank you for your time and consideration.

Sincerely,

Amanda Antholt
Civil Rights Team

cc:    Anne Rayhill, IDOC Legal Counsel (by email)
       Andrew Waters, IDOC ADA Compliance Officer (by email)
       Eric Bernard (by mail)

# LOEVY & LOEVY

EXHIBIT # 7

311 N. Aberdeen St., 3rd Floor, Chicago, Illinois 60607

March 31, 2021

Warden Sonja Nicklaus
Dixon Correctional Center
2600 N. Brinton Avenue
Dixon, IL 61021

RE:  Inmate Eric Bernard (R 25398)

Dear Warden Nicklaus

We write to follow up on a message, that Heather left with your staff earlier today reporting concerns we have on behalf of our client Mr. Eric Bernard, who is an inmate at Dixon Correctional Center ("Dixon"). Mr. Bernard spoke with both of us during separate legal calls with him in our respective cases on Monday, March 29th. Mr. Bernard reported to both of us that he has not been receiving appropriate care, including long delays in staff changing his incontinence briefs, being left alone in his cell without any assistance with his movement, and inconsistencies with his meals.

We would appreciate your apprising us of Mr. Bernard's care, how frequently his incontinence briefs are being changed as well as other medical care he is being provided to assist with physical movement and if there are any issues with providing him regular meals.

Thank you in advance for your attention to this matter. Heather can be reached by phone at 312-339-8112 or by email at heather@loevy.com. Molly can be reached at 317-750-4830 or by email at mblaase@kdvlaw.com.

Sincerely,

Heather Lewis Donnell

Molly J. Blaase

EXHIBIT #8

In re Adoption of T.B., Not Reported in N.E. Rptr. (2021)
2021 IL App (4th) 200575-U

2021 IL App (4th) 200575-U

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

<u>NOTICE</u> This Order was filed under Supreme Court Rule 23 and is not
precedent except in the limited circumstances allowed under Rule 23(e)(1).
Appellate Court of Illinois, Fourth District.

IN RE ADOPTION OF T.B.

(Caleb S. and Jasmen S., Petitioners-Appellees,

v.

Eric B., Respondent-Appellant).

NO. 4-20-0575
|
April 8, 2021

Appeal from the Circuit Court of Champaign County, No. 19AD10, Honorable Randall B. Rosenbaum, Judge Presiding.

## ORDER

PRESIDING JUSTICE KNECHT delivered the judgment of the court.

**\*1** ¶ 1 *Held*: (1) The trial court did not err by not entering a directed verdict in respondent father's favor at the close of petitioners' case.

(2) The trial court's finding respondent father was an unfit parent based on depravity was premature.

(3) The trial court abused its discretion in denying a motion to continue that would have allowed respondent father to review discovery materials based on the erroneous conclusion evidence of rehabilitation was irrelevant to the charge of depravity.

¶ 2 In February 2019, petitioners, Caleb S. and Jasmen S., filed a petition to adopt, seeking to terminate the parental rights of respondent father, Eric B., as to T.B. (born June 22, 2010). Jasmen is the biological mother of T.B., and she was married to Caleb. Petitioners alleged Eric was an unfit parent on multiple grounds, including that he was depraved.

¶ 3 After finding Eric depraved and unfit, the trial court, in September 2020, terminated Eric's parental rights as to T.B. Eric appealed, arguing (1) a motion for a directed verdict in Eric's favor at the close of petitioners' case was obligatory and should have been granted, (2) the finding of depravity was against the manifest weight of the evidence, and (3) the trial court abused its discretion by delaying its ruling on Eric's February 24, 2020, motion to continue the adjudicatory hearing and in denying him leave to file a late response to the request to admit facts. Agreeing in part with the third argument, we reverse and remand.

¶ 4 I. BACKGROUND

¶ 5 In their petition, Jasmen and Caleb alleged Eric, a prisoner at the Pontiac Correctional Center, was an unfit father on multiple grounds under section 1(D) of the Illinois Adoption Act (750 ILCS 50/1(D) (West 2018)). One of the grounds of unfitness

alleged was depravity based on Eric's criminal convictions and failure to conform to society's norms (750 ILCS 50/1(D)(i) (West 2018)). Petitioners alleged termination of Eric's parental rights and the adoption of T.B. were in the best interest of T.B.

¶ 6 On February 24, 2020, the hearing on parental fitness was set. At the start of the hearing, Eric's counsel reported she had spoken to staff of the Department of Corrections (DOC) on Thursday, February 20. She was assured the "writ" had been accepted and "[i]t had been planned for and *** the transportation would be handled appropriately." Counsel reported she received a call at 7:37 a.m. that day and was informed transportation could not occur. It was planned Eric would be in a wheelchair. When they attempted to put Eric in a wheelchair, he represented he was not strong enough to sit in the wheelchair and "was sliding down the wheelchair." An ambulance had not been planned, so one was not available that morning. A DOC staff member said an ambulance could transport Eric in a bed at another time. Counsel stated, "I do believe that I have to request a continuance" until Thursday to get an ambulance. Counsel reported Eric had a massive stroke after receiving the petition and preparing a response. Eric had moved to multiple facilities seeking medical treatment but was at Dixon Correctional Center at the time of the hearing.

*2 ¶ 7 The trial court questioned counsel regarding how much time was needed for a hearing. The court then asked petitioners for their response to Eric's counsel's request for a continuance. Petitioners' counsel began by asking, "as an evidentiary matter, we can admit—and I've got it right here, and I definitely think we need to do this. We can admit his responses to the request to admit. He had counsel. He was represented by counsel and he made these admissions. So I think that's an evidentiary matter we can take care of first."

¶ 8 The trial court agreed first to the issue regarding the requests to admit. The court asked Eric's counsel if there was an objection. Counsel responded: "I do believe, yes, this was agreed upon after my conversation with him. I was just looking through my notes to confirm my recollection." The court ruled it would admit the exhibit. Petitioners stated they would produce no other evidence. Eric's counsel stated she would call Eric to testify and then they would have arguments.

¶ 9 Petitioners objected to the continuance, noting petitioners had been waiting but agreed they could continue the matter until Thursday if the court would proceed immediately to the best-interest hearing. Eric's counsel had no objection. The trial court continued the matter until Thursday.

¶ 10 The adjudicatory hearing on the petition was held on February 27, 2020. Eric was present in the custody of DOC. He appeared at the hearing on a gurney with his feet and hands restrained. The trial court noted it admitted the request to admit into evidence without objection. The court further noted for the record the answers were deemed admitted, denied, or withdrawn by agreement. Petitioners had no other evidence to admit on the issue of unfitness.

¶ 11 Eric was deemed to have admitted the following offenses: (1) 2003 conviction for felony aggravated battery of a peace officer in Cook County; (2) 2004 convictions of three felony counts of armed robbery in case Nos. 04-CR-1402701, 04-CR-1502801, and 04-CR-1502601; (3) 2005 conviction of felony aggravated battery of a peace officer; (4) 2006 conviction for home invasion causing injury; (5) 2006 conviction for escape with a dangerous weapon; (6) 2006 conviction for residential burglary; (7) 2006 conviction for attempted aggravated arson; (8) 2006 conviction for aggravated battery harm of a peace officer; (9) 2006 conviction for aggravated battery of a government employee; and (10) 2010 conviction for armed robbery with a firearm. Eric was also deemed to have admitted he was serving a 55-year prison sentence with a projected parole date of February 19, 2038.

¶ 12 Eric testified on his own behalf. He was convicted of his last offense in February 2014 and had been imprisoned since that time. In the beginning of 2010, Eric was incarcerated. Eric "used to see [T.B.] on the phone," and Jasmen brought T.B. to see him. Eric testified, "and then a couple of years, you know, due to a court order, me and [Jasmen were] co-defendants on a case. Someone said the conclusion of that case, though, the judge ordered that it be no communication between the both of us, you know, because we [were] co-defendants and they ain't whatever. So—so after like 2016, that's when [Jasmen], you know, got

back in tune with me, my son wanted to contact me, and then that's when we started talking, writing each other, and we was just doing that for years." Eric wrote T.B. letters. Eric testified he tried to educate his son on history, including black history and American history, as well as politics. T.B. wrote letters, too. He sent drawings. The two developed a "real close" relationship.

**\*3** ¶ 13 When asked about employment, Eric testified to the following: "No, but I was receiving—you know, I had income coming in when I was first incarcerated. And during that time, like when my son was first born from like 2010 to 2012[,] I was sending [Jasmen] over like a couple of thousands, like just at a time. Like asked, you requested, or just sending it, just so she could have things for her and my son." With money Jasmen sent him, Eric sent his son "cards and stuff like that" for holidays and his birthdays.

¶ 14 Eric testified after Jasmen met Caleb things changed. Jasmen and Caleb did not provide Eric with T.B.'s address, meaning DOC would not allow him to send anything. Eric stated he hired an attorney to fix the situation but due to Caleb's "insecurities \*\*\* that was unable to happen."

¶ 15 Eric further testified about the current status of his most recent criminal case. He testified he was "going through the wrongful[-]conviction thing" as "[t]hey just found out another guy committed the crime." According to Eric, three people were involved: "It was me, the plaintiff, [Jasmen], and my cousin, Michael King. He just got out. He's—he got released last year. He got exonerated."

¶ 16 On cross-examination, defendant testified he did not know whether Jasmen pleaded guilty to an obstruction-of-justice offense involving hiding Eric's name from the police. As to the money he sent to Jasmen for T.B., Eric testified he received that money from his family. When asked what he had done to rehabilitate himself from his twelve felonies, Eric testified he obtained his paralegal certificate and he taught classes, such as "crafts classes on history, black history." Eric did "a lot of legal stuff" and helped firms. Eric further testified to the following:

"I'm doing—I also got, you know, you know, like mental problems and stuff like that. That kind of—most of my convictions back then that you're referring to as far as aggravated batteries, those is like mental-related, it wasn't no gang-related stuff. It was just, not off of my medication and stuff like that, getting the proper treatment that I was supposed to get, and it resulted to me flipping out and freaking out. So they just learned recently that I had these problems since I've been incarcerated this time, and I've been in the—what's called a residential treatment unit. And I learned like coping skills and stuff like that, how to better cope with my anger, and you know, grief, and loss, and stuff like that. I got these certificates, so I'm actually still in the program. It'll take a few years, but I'm doing pretty good, though. That's what I've been doing over the years, basically trying to get in tune with myself, to make myself a better person, a better man, too, so I can live. I don't want to get out of prison doing the same things that I was doing before."

¶ 17 After counsel asked if he provided copies of the certificates to paralegal school or other documentation to his attorney, Eric testified his attorney did not ask for those documents. When asked about his 2003 offense, Eric testified he was off his medication and he did not remember the details. When asked about the 2004 armed-battery convictions, Eric denied guns were used. He explained he was in prison and it was just regular batteries: "no, it's just a regular battery. It's just—I can, like if I freak out and they trying to restrain me, and like, you know, I'm, get off me, get off me. And I'm like, you know, I'm off my medicine." Eric disagreed his 2005 felony aggravated-battery-of-a-peace-officer-with-a-firearm offense meant he had a gun. Eric explained it was the same situation where the officer was attempting to restrain him and Eric was not on his medication.

**\*4** ¶ 18 Eric denied committing the 2006 home invasion offense and residential burglary, stating he was incarcerated from 2004 to 2009. Eric maintained the information regarding his convictions was inaccurate. In 2006, Eric was convicted of attempted aggravated arson in Cook County. Eric explained he, at the time, was off his medication and "they didn't know that I was supposed to be in the certain ward that I was in, and I had just lit—lit my cell on fire, inside my cell. Voices was telling me

In re Adoption of T.B., Not Reported in N.E. Rptr. (2021)

2021 IL App (4th) 200575-U

to do it." When asked about the nature of the aggravated batteries in 2006, Eric testified "[b]eing in restraints." In 2010, he had a felony armed robbery with a firearm in De Kalb County. Eric stated, "That's the one that I'm on the wrongful conviction exoneration out."

¶ 19 Eric testified his mental problems were recently diagnosed and he had just begun getting treated for those issues. Eric stated he had been getting better and "just working towards my freedom." Eric said he was "going to get exonerated *** like [his] co-defendants just did."

¶ 20 Petitioners then tendered copies of their interrogatories, to which Eric's counsel did not object. After the trial court stated, "They will be admitted," Eric stated: "Hey, your Honor, I would like to object. If she ain't finna—I'll—I'll just dismiss her—." Eric stated he wanted to proceed *pro se*. Eric told the court he could not tolerate his attorney's lack of effort in helping him, stating the following in part:

"I don't even know this lady. She don't know me. She don't care about my son, obviously, because she didn't even ask me anything about these questions. I got letters. I got stuff. I even—even if the plaintiffs—the plaintiff brought Ms. Cunningham to see me in prison. They know I'm not a bad person or anything like that. Whatever this tricked off with this is for personal reasons. And we talked about this, and she said different things to me that's happening today. So I will do my own defense, and do whatever I got to do."

¶ 21 Eric further explained to the trial court appropriate accommodations had not been made for his medical care needs. Eric explained he had been sitting in a soiled diaper for hours. Eric reported he used the bathroom at 6:30 a.m. and had been forced to sit in feces with open sores. No one was available to clean him. He reported he needed help.

¶ 22 The trial court stated it understood Eric's argument and it would take up Eric's request in "a minute." The court observed Eric was in the middle of his testimony and defense counsel and the guardian *ad litem* (GAL) might clear up some of the questions. The court stated it would consider Eric's request to represent himself after his testimony.

¶ 23 On redirect examination, Eric testified he had suffered multiple strokes. He believed he had suffered more than 10. They began after he was served with the petition to adopt. The "husband" did not want Eric to send gifts or letters. Eric's whole focus was on his son. Eric testified his diagnosis was "something like cerebral or something" and it was "like a gene" and a "rare brain disease." The disease attacked his cells, which narrowed the vessels and led to the strokes. Eric was sick and unable to speak for quite some time. Eric was taking Seroquel after he was incarcerated the first time. He could no longer take that medication due to his strokes. Eric's treatment was "more like daily one-on-one individual treatment to help [him] cope ***." Eric's health continued to be an issue. He used to be handfed. He had to wear diapers.

¶ 24 Eric testified he had communicated a couple of times with his counsel by phone. The two talked and Eric reported he answered every question he was asked. He did not remember the questions petitioners' counsel was asking. Eric stated his counsel did not ask those questions. Eric's counsel asked, "we did not go over the request to produce; is that correct?" Eric responded, "I don't know those titles like what you saying[;] I just remember the question." Eric's counsel asked, "So we did the questions that—the questions that you did not recognize, we did not go over?" Eric responded as follows:

**\*5** "Because I got letters. I got letters from my son. I got letters from Jasmen. I purely love, it's no problems or complications recently, up until you know, the boyfriend, husband, or boo boo, whatever you want. But the thing is, what I'm trying to say is like I—you didn't ask me about none of those things. And if you were to ask me, I would have told you I got them in my possession, as far as like, like the records of the—you know what I'm saying? The, the trust fund and then all that, and my attorney. My attorney tried to send [T.B.] clothes and all type[s] of stuff for Christmas, that before prior to the stroke. And you didn't ask me about none of that stuff. So, that's why I'm just asking the judge to proceed *pro se*."

¶ 25 Eric stated counsel was not doing anything to show he was involved in his son's life. Eric further asked for more time to go over discovery. Petitioners' counsel objected, stating there was no reason to continue the case as respondent had been represented by counsel.

¶ 26 The trial court asked what evidence Eric would produce on the issue of fitness. Eric responded as follows: "I got documentations from doctors, psychiatrists. I got certificates, I got all type of stuff that I could present to the court and show that I'm fit to, you know, remain within my parental rights."

¶ 27 The trial court asked petitioners' counsel the following: "Are you arguing, based on the testimony here today, that you are going forward on all—all of those, or just certain ones? Because it may affect the need for other evidence."

¶ 28 Petitioners' counsel responded: "I would be willing to proceed on depravity alone. And I—if I—I don't know the exact time frame, but I would like to say, and I need to say this very clearly to [Eric] and everybody else in the courtroom, that there are other parties with rights here, too, and my clients have proceeded through the unfitness proceeding, and any delay at this time is unnecessary and certainly harms their position in wanting to form a family for the child, and their right to proceed ***."

¶ 29 The trial court determined any evidence Eric was hoping to produce would go to issues related to T.B.'s best interest and thus the court would not rule on Eric's request to terminate counsel until after ruling on the matter of his parental fitness:

"He believes that he may be exonerated of the most recent one for which he's in custody. He is asking to represent himself, which I'm going to deal with in a moment.

He is asking for more time to go through information, and perhaps produce additional testimony and evidence. It appears, however, that [petitioners] at this point is only going on the depravity count, and the types of evidence that [Eric] seeks to introduce appear to be more best[-]interests issues. I love my son. I want to have contact with my son. I have people who can say that. There's been communication with my son[;] *I have rehabilitated myself by going through classes. But they really don't bear on the issue of fitness.*

THE RESPONDENT: Yes, they do.

THE COURT: And therefore what I'm going to do at this point is go forward on the issue only of fitness right now ***." (Emphasis added).

¶ 30 The trial court heard argument. Eric's counsel argued the following in its entirety, answering one question by the trial court:

"[ERIC'S COUNSEL]: Yes, your Honor. My client does not—I understand the cases that he's been charged with. My client does not believe that he technically is defined as depravity [*sic*]. He believes that under the statute, which I have reviewed, it deems the last conviction needs to be within five years of the filing of the petition. He would like to point out that the petition is not within five years of his last conviction.

*\*6* THE COURT: But—but doesn't that just bring in the presumption? It's not that he couldn't have a lot of other convictions. The presumption [does not] kick in unless it's within the last five years?

[ERIC'S COUNSEL]: Correct.

THE COURT: Okay, go ahead.

In re Adoption of T.B., Not Reported in N.E. Rptr. (2021)

2021 IL App (4th) 200575-U

[ERIC'S COUNSEL]: But he believes that you should consider that and consider that the last conviction that he's had has been beyond the five-year limit. Thank you, your Honor."

¶ 31 The court asked Eric if he had a response. Eric said he had been struggling his entire life. When he was eight years old, he saw his father shoot and kill his mother. He had been working with PTSD and had been incarcerated his entire life. Eric reported he was dealing with the issues:

"And that's where the certificates come, and my psychiatrists and all that. They'll be able to tell you more, like how traumatized I was, and how the treatment that I wasn't—that I needed but wasn't getting at those times when I was, you know, catching all those cases and stuff like that. They didn't even know that, you know, I needed help at that time, because they never evaluated me. *** And now they all getting resolved. I haven't been getting in any trouble. You know, I know how to control myself, and you know, manage, you know, my anger, and you know what I'm saying, impulse and all other type of *** regulations ***."

¶ 32 The trial court observed, given the time that passed, there was no presumption of depravity but found Eric unfit based on depravity:

"He has indicated by his own statement that many of these prior convictions were because of mental[-]health concerns, which very well may be true. I'm not saying that they're not, and I can take him for his word that they were. But the statute doesn't talk about the basis of the convictions. It doesn't talk about what the sentence should be, whether it's prison or probation with mental health. It is the conviction itself ***.

* * *

The court finds that based on all of the testimony, the admissions and everything else, much of the argument by [Eric] really goes more towards best interests rather than fitness. The court does find by clear and convincing evidence, and even if the standard were beyond a reasonable doubt, the court would find beyond a reasonable doubt that based on his ongoing lifestyle of committing offenses in a variety of different contexts, different offenses over the course of time, and they are all very serious; even if I exclude the last one, shows that he clearly is at the point where he has a deficiency in the moral sense shown by the inability or unwillingness to conform to accepted morality."

¶ 33 After finding Eric unfit, the trial court questioned Eric regarding his decision to proceed *pro se*. The court noted it did not believe any alleged deficiencies by Eric's counsel affected the fitness issue. The court observed "if anything, it bears on the best interests, because on the best interests it's not just do you have prior convictions, it's, you know, do you have contact? Should you continue to have contact? Are you rehabilitating yourself?" The court granted Eric's request to terminate his counsel and represent himself.

¶ 34 On March 11, 2020, Eric filed a *pro se* motion to vacate the order of unfitness. Eric argued the trial court denied him the opportunity to present evidence to challenge the depravity claim. Eric further maintained the trial court "relied on unsupported and false evidence." We note this motion was not ruled upon until December 2020, months after the order terminating parental rights was entered. An email from the court clerk to Eric's appellate counsel indicates Eric's *pro se* motion, which did not indicate whether the motions were sent to opposing counsel or the GAL, was not docketed and the trial court was therefore unaware the motion existed. The email further states the court found the motion untimely and meritless and denied it.

*7 ¶ 35 The best-interest hearing was held in September 2020. Eric did not appear. The trial court called one witness, Latonya Stovall, a court clerk. According to Stovall, she spoke with DOC that day and the day before regarding Eric. DOC asked if the matter could be addressed over Zoom. The trial court denied DOC's request. At 8 a.m., Stovall received another call from DOC. Eric refused to attend court. It was reported Eric "said that if he was to come, he would throw feces, he would poop on [himself],

throw feces[;] he would fight staff, he would fight corrections, and do whatever he could do to disrupt the proceedings." The warden decided not to transport Eric to the hearing.

¶ 36 Caleb testified he and Jasmen were married in 2018. T.B. was the oldest of four children in the family. T.B. was 10, and T.B.'s sisters were 4, 2, and 1. Caleb's and T.B.'s relationship was "great." They played sports and video games. They spent one-on-one time together, going each Saturday for haircuts. They loved each other. Caleb was employed full-time and had no criminal record. Caleb provided for T.B. just as he did for his other children. T.B. regularly met with Caleb's extended family, attending "fish Friday" every week. Caleb's mother watched T.B. while he was participating in virtual learning.

¶ 37 Jasmen testified she worked at Brookdale Senior Living. She and Caleb supported the children. She wanted Caleb to be T.B.'s father.

¶ 38 The trial court found it clearly in the best interest of T.B. that Eric's parental rights be terminated. The court made a finding of no just reason to delay enforcement or appeal.

¶ 39 On October 5, 2020, Eric filed a motion for a new trial or for reconsideration of the order terminating his parental rights. In his motion, Eric asserted he did not refuse to be present nor did he refuse to go to court. Eric stated DOC failed to make accommodations for medical aides to be present during court. Eric stated he needed a high level of care and no care would have been provided to him. Eric also asserted the trial court failed to issue subpoenas for witnesses to testify on his behalf. Eric asked Judge Rosenbaum be removed and requested a new trial judge.

¶ 40 A hearing was held on Eric's motion on October 16, 2020, before Judge Anna M. Benjamin. Eric appeared *pro se.* At the hearing, Eric was asked for argument on his motion to substitute Judge Rosenbaum. In responding, Eric discussed his absence from the best-interest hearing: "I wasn't even there present to hear what was heard, present evidence on my behalf to squash the second phase of the termination of the parental rights and stuff like that. I had evidence, you know, witnesses that I had to present and be asked, you know, why my rights shouldn't be terminated. And I was denied that. I don't know what happened as far as me not appearing, but he made that ruling, so that's why I had included that in there."

¶ 41 Eric further explained there was no evidence presented showing he waived his right to attend the hearing. Eric emphasized no one from DOC appeared and testified he "refused to come to court or anything like that." Eric further stated the following:

"I would have been able to express those things to him. I would—the judge still—Judge [Rosenbaum] still executed exactly what—it was planned out, like, in my—in my opinion. All of this whole thing was planned out, like, I don't know why I didn't come to court. You can't refuse court in [DOC]. They are—force you whether you—if you don't want to come willingly, they will force you to come.

So, it's a thing with me. I got medication conditions as far as, life, self-care and stuff like that, and Judge [Rosenbaum] know[s] this. So, a—a situation happened the last time we showed back on February 27, and it was an investigation at [DOC] concerning, like, staff, like, inappropriately touching me and stuff like that, you know, some EMTs. And the EMTs alleged that the judge ordered—Judge [Rosenbaum]—ordered them to, you know, clean me or whatever like that and stuff like that. So, the investigators had to come out and talk to Judge [Rosenbaum] and stuff like that."

**\*8** ¶ 42 Judge Benjamin ruled against Eric on his request to substitute Judge Rosenbaum, finding Eric had not provided any cause or specific bias to warrant his removal. The court ruled the issue of whether it was appropriate to proceed in his absence was a separate and distinct issue.

In re Adoption of T.B., Not Reported in N.E. Rptr. (2021)
2021 IL App (4th) 200575-U

¶ 43 The remaining issues in Eric's motion were considered by Judge Rosenbaum. The trial court addressed the main error asserted in Eric's motion for a new trial: the best-interest hearing should not have been held in his absence. Eric was placed under oath.

¶ 44 The trial court observed it had received incident reports from September 24, 2020, from DOC. The court read the report:

"On September 24th at 4:25 a.m., this employee, Justin Wilkes (phonetic), received a call from the shift supervisor in reference to Eric Bernard. Major Masters (phonetic) reported that Bernard was refusing to go to court, stating that the ambulance was on grounds and prepared to transport Bernard to Champaign County, but Bernard was refusing to go. Bernard was telling staff that he was just going to, quote, bug up, and assault staff if we made him go. Bernard was scheduled to be in court at 9 a.m. and due to the time of the incident, the length of time it takes to drive to Champaign, and the offender's prior staff assaults, this employee gave direction not to force Bernard into restraints and into the ambulance."

¶ 45 The next report was dated September 24, 2020, with a time of 4:10 a.m. According to that report: "[Eric] told his sergeant, that's Sergeant Harris (phonetic), that he was refusing to go on his writ because he stated, quote, there is nobody going to take care of me medically and I will just have to bug up."

¶ 46 The trial court asked Eric the reason he could not attend court that day. Eric responded as follows:

"They didn't allow me to come to court. That information you just read[;] none of that happened. I was told earlier that I was gonna go to court, but due to the incident that happened the last time we was at court, when I was left in feces and urine for hours and there weren't nobody to change me. And the EMTs that changed me wasn't certified to do it, so a—a big old investigation came behind that, and you were aware of that because they talked to you, contacted you. But as a result of that, they was trying to figure out how they was gonna send me to court and assure that my medical needs was being met."

¶ 47 The trial court observed the best-interest hearing was originally scheduled for March 12. Due to the coronavirus pandemic, the hearing was ultimately moved to September 24, 2020. The trial court sent Eric a letter in June informing him of the September 24, 2020, hearing date. The court noted at no time did the court receive correspondence from Eric indicating concerns or issues with DOC and its ability to provide medical services to Eric while in court. The court found the letters received from DOC consistent with the testimony of his clerk on September 24 regarding reasons Eric was not going to court. The court found the incident reports credible and no good cause for a new hearing.

¶ 48 This appeal followed.

¶ 49 II. ANALYSIS

¶ 50 A. Ineffective Assistance for Failure to Seek a Directed Verdict

¶ 51 Eric first argues he was denied the effective assistance of counsel when his counsel at the hearing on parental fitness failed to move for a directed verdict at the close of the petitioners' case. Eric contends the petitioners elected to proceed only on the claim of depravity but the evidence presented was insufficient to establish he was unfit based on depravity. Eric concludes, had counsel moved for a directed verdict, it was incumbent upon the trial court to grant it.

**\*9** ¶ 52 Claims for ineffective assistance of counsel require proof of two factors: (1) counsel's representation fell below an objective standard of reasonableness and (2) but for that error, a reasonable probability exists the outcome of the proceeding would have been different. See *People v. Peeples*, 205 Ill. 2d 480, 512-13, 793 N.E.2d 641, 661-62 (2002). To succeed on this

In The United States District Court For The
Northern District Of Illinois, Western Division

Eric E. Bernard,
    Plaintiff,

V.

Rob Jeffreys,
    Defendants

Case No. 20-CV-50412

Judge Iain Johnston

---

## Motion For Preliminary Injunction And Temporary Restraining Order

Now Comes The Plaintiff, Eric E. Bernard, Moving This Court To Grant His Motion For Preliminary Injunction And Temporary Restraining Order pursuant To Federal Civil Procedure Rule 65 And States As Follows:

1. Plaintiff Is Currently Housed At Dixon Correctional Facility In The Health Care Unit And Has Been Housed There Since September 2019.

2. Dixon Facility Nor Any Facility Within The Illinois Department Of Correction Has A Unit For The Physically And Mentally Impaired Prisoners.

3. Dixon Facility is not accommoding nor antisipating plaintiff's disability needs.

4. The lack of ADA equitment/and improper equitment has injuried and continue to injury plaintiff.

5. Plaintiff body is detorating due to not recieving comprehensive therapy and occupational therapy.

6. Plaintiff is being denied proper self care assistance by medical staff, which led to him having skin infection

7. Plaintiff is being subjected to cruel and unusual punishment by the DOC and it's Medical Providers by failing to provide plaintiff with self care Assistance while outside the facility at Court and Hospitals

8. Due to the total isolation and lack of socialization with his peers, plaintiff is at high risk for suicide as his mental illnesses continue to worsen.

9. The DOC is denying plaintiff access to programs, activities and other privileges based solely on his disability and fail to make reasonable accommodations in violation of the Americans with Disabilities Act 42 U.S.C § 12132 and Rehabilitation Act 29 U.S.C. § 794 (A)

10. Plaintiff has addressed these above issues with Wardens and DOC Director but nothing has been done.

11. Plaintiff request that this court uses it's authority and grant injuntive Relief.

# Factual History

## Mental Health.

12. Plaintiff has been diagnosed with Post Traumatic Stress Disorder (PTSD); Schizo Affective Bi Polar Disorder; Anti and Borderline Personality Disorder (see exhibit # 1 and 2)

13. Plaintiff has a lifetime history of recieving a high level of Mental Health Care to some what control his Mental Health Disorders.

14. Plaintiff has a history of near fatal self harm and suicide attempts (see exhibit # 1, 2)

15. Plaintiff has been under Residential Treatment Unit (RTU) level of care in the Illinois Department of Corrections since 2016.

16. Plaintiff has not been recieving adequate Mental Health care since being at Dixon Facility (see exhibit # )

17. Plaintiff, his attorneys, Pablo Stewart (appointed court Monitor in Class action Rasho v. Baldwin, No. 2007-1298) and other Mental Health staff at Dixon facility — that due to the lack of out cell time; isolation; no socialization with peers is causing plaintiff to self harm, high risk to suicide and a threat to himself and that he is mentally detiorating — to DOC staff but no actions have yet been taken

# MEDICAL

19. In MARCH 2019, plaintiff suffered from several brain infections, which resulted in him suffering from a stroke, which left him physically impaired to the point were he cant walk, sit up, sit in a regular wheel chair and needs assistance eating/bathing/clothing etc.

20. Due to plaintiff's high need of self care assistance, he is housed in the Dixon Correctional Center's infirmary.

Plaintiff is confined to his bed and geriactrics chair and is need of full assistance. (see exhibit# 1)

21. plaintiff has filed grievances to it's higher level requesting proper care and accommodations but the DOC refuse to take any actions

Need For Temporary Restraining Order and. Need For Prelimary Injunction. The DOC'S Failure to provide care and Accommodations by:

22. Not providing plaintiff adequate self care assisounce outside and inside the facility;

23. Shortage of staff (medical and security);

24. lack of functional ADA assistive devices/equiptment (including Hoyer lift, geri chair, automatic medical beds);

Not monitoring staffs behavior and inmates behavior as to being assaultive/being inappropriate/not providing care for plaintiff and other offenders who is under self care status;

27. Authorizing untrained inmates to operate medical equitment/devices and provide self care assistance to plaintiff and others;

28. Violating plaintiff's privacy and for his naked body not to be exposed to other inmates and bypassing staff;

29. Denying plaintiff out of cell unstructured and structured time;

30. Has plaintiff isolated with no socialization to others;

31. Failure to create a Mental Health Treatment Plan that will reduce the high risk of self harm and suicide;

32. Failure for the Wardens to follow plaintiff's Mental Health Treatment Plans;

33. Failure to provide plaintiff with occupational therapy; Failure to provide plaintiff with intensive physical therapy;