## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| ERIC BERNARD (#R-25398), a/k/a TERRELL KING,<br><br>    Plaintiff,<br><br>  v.<br><br>ROB JEFFRIES, ANDREA TACK, SONJA NICKLAUS, JOHN VARGA, ANN GRANGER, MONICA CARPENTER, CELIA GROSSMAN, LACI BARLO, WEXFORD HEALTH SOURCES, INC., UNKNOWN WEXFORD HEALTH SOURCES EMPLOYEES, and UNKNOWN ILLINOIS DEPARTMENT OF CORRECTIONS EMPLOYEES,<br><br>    Defendants. | Case No. #:20-cv-50412<br><br>Hon. Iain D. Johnston |

## AMENDED COMPLAINT

NOW COMES Plaintiff Eric E. Bernard, by and through his counsel, for his Amended Complaint against Defendants Illinois Department of Corrections and Wexford Health Sources, Inc. (collectively, "Defendants"). In support of his Amended Complaint, Mr. Bernard states as follows:

### Introduction

1. This civil rights action is brought to redress Plaintiff Eric E. Bernard's federally protected rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*.

2. Mr. Bernard is a thirty-eight-year-old man and is currently incarcerated at the Dixon Correctional Center ("Dixon"), in the care and custody of the Illinois Department of Corrections ("IDOC").

3.      From an early age, Mr. Bernard's life has been marked by tragedy. At the age of nine, Mr. Bernard witnessed his father murder his mother. Days later, Mr. Bernard witnessed his uncle murder his father.

4.      As a result, Mr. Bernard suffers from acute post-traumatic stress disorder and other lasting mental disabilities.

5.      But rather than provide adequate mental health treatment for Mr. Bernard's mental disabilities, IDOC staff often left Mr. Bernard to languish in isolation. During his isolation, Mr. Bernard suffered flashbacks and attempted suicide multiple times.

6.      During one-such suicide attempt on or about March 20, 2019, Mr. Bernard suffered a stroke-like episode that left him incapacitated. As a result, Mr. Bernard remains unable to walk, stand, sit up on his own, or perform basic tasks like eating, bathing, and toileting.

7.      While under the care of the IDOC at the Stateville Correctional Center ("Stateville") and University of Illinois Hospital ("UIC"), Mr. Bernard was neglected, mistreated, and denied needed medical care. Mr. Bernard's mistreatment prior to being transferred to Dixon is the subject of at least three other currently pending lawsuits.

8.      For example, on or about August 27, 2019, Stateville Corrections Officers ordered Mr. Bernard to walk to his cell door and present his wrists to "cuff up," despite Mr. Bernard's known physical disabilities. When Mr. Bernard could not comply with their directives, Stateville officers repeatedly attacked and maced Mr. Bernard before extracting him from his cell. *See Bernard v. Baldwin*, *et al.*, 20-cv-5368 at Dkt. No. 57.

9.      Mr. Bernard's physical condition continued to deteriorate after his stroke, in large part due to IDOC and nursing staff's refusal to provide Mr. Bernard with rehabilitative care to regain physical mobility. When Mr. Bernard was admitted to outside facilities for therapy, IDOC

staff refused to unshackle Mr. Bernard's legs and arm from his hospital bed, thereby preventing his medical team from providing him physical therapy and contributing to his physical deterioration. *See Bernard v. Jeffreys*, *et al*., 20-cv-5341 at Dkt. No. 24.

10.    As a result of the persistent efforts of an attorney advocate, Mr. Bernard was transferred to Dixon, a medical facility which purported to be better equipped to accommodate Mr. Bernard's grave physical disabilities.

11.    Tragically, Mr. Bernard continues to face discrimination while at Dixon because of his disabilities. Mr. Bernard brings this action to redress the harm he has endured while at Dixon, whose staff continue to intentionally discriminate against him, and to compel staff to provide him necessary accommodations for his disabilities.

## Jurisdiction and Venue

12.    This court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(a), as Mr. Bernard's causes of action are brought under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*.

13.    Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1) and (2), as the events giving rise to this lawsuit occurred in this judicial district.

## Parties

14.    Mr. Bernard was, at all times relevant to this complaint, a prisoner incarcerated at Dixon located at 2600 N Brinton Ave in Dixon, Illinois. Mr. Bernard remains currently incarcerated at this facility.

15.    Defendant IDOC is a government agency responsible for all Illinois state prisons, including Dixon.

16.    Defendant Wexford Health Sources ("Wexford") is a corporation headquartered

in Pennsylvania and doing business in Illinois. Wexford contracts with the State of Illinois to provide healthcare at IDOC prisons throughout the state, including Dixon. In addition, Wexford is a recipient of federal funds.

## Facts

### A.    Mr. Bernard's Disabilities

17.    On or about March 20, 2019, while incarcerated at Pontiac Correctional Center, Mr. Bernard suffered a severe medical event comprising of seizures and dyskinesia, which physicians later described as L-sided mutifocal subacute infarcts. This stroke-like event rendered Mr. Bernard nearly completely incapacitated, with extreme body weakness and an inability to move the entire right side of his body. Mr. Bernard was unable to walk, stand, or otherwise move without assistance.

18.    Mr. Bernard has also been diagnosed with severe mental illnesses including schizophrenia (bipolar), post-traumatic stress disorder, antisocial personality disorder, and borderline personality disorder. For years, Mr. Bernard has been denied mental health medications to manage these long-term disabilities.

19.    On or about March 30, 2019, Mr. Bernard was referred to UIC, who arranged for Mr. Bernard to be placed at Schwab Rehabilitation Hospital ("Schwab") to receive treatment and rehabilitative care for the effects of his stroke.

20.    On or about April 19, 2019, Mr. Bernard was admitted to Schwab to begin physical therapy, occupational therapy, and other forms of treatment related to his stroke. While at Schwab, Mr. Bernard made marked progress towards regaining some physical functioning, including the ability to stand from his wheelchair using grab bars with minimal assistance, and was able to groom and dress himself with some assistance from staff.

21.     However, Mr. Bernard was only permitted to receive therapy for small amounts of time due to IDOC's refusal to unshackle him, in direct conflict with Mr. Bernard's doctors' advice and treatment plan.

22.     Mr. Bernard was once again admitted to UIC on June 19, 2019, at the recommendation of his primary neurologist due to the worsening of Mr. Bernard's medical and physical condition. Upon discharge, Mr. Bernard's neurologist recommended that he return to Schwab to continue his physical therapy.

23.     Schwab agreed to accept Mr. Bernard as a patient upon release from UIC. Despite this, IDOC and Wexford refused to allow Mr. Bernard to return. Instead, Mr. Bernard was sent back to Stateville, and later transferred to Dixon, where he has continuously been denied the physical, occupational, speech, psychological, and medical education therapy recommended by his neurologists and other treating physicians at UIC.

24.     Mr. Bernard was transferred to Dixon on or about September 6, 2019 and is housed in the facility's Health Care Unit.

25.     At the time of Mr. Bernard's transfer to Dixon, he was, and remains, in need of comprehensive therapy related to his stroke. Dixon and Wexford remain unwilling to provide Mr. Bernard with comprehensive therapy and the comprehensive assistive devices required to improve Mr. Bernard's functioning.

26.     Not only have staff denied him the therapy and accommodations Mr. Bernard needs for his condition to improve, but their denials have also increased the risk of new medical complications. For example, Wexford staff has also informed Mr. Bernard that they are not trained to perform range-of-motion exercises on physically disabled prisoners such as Mr. Bernard who are at risk of muscle atrophy and bed sores. Due to Wexford staff's refusal to

perform this basic nursing intervention, Mr. Bernard is forced to endure pain for extensive periods of time and remains at risk of further muscle weakening and bed sores.

### B. Denial of Safe and Adequate ADA-Assistive Devices

27.     Dixon does not have appropriate facilities, equipment, or staff to provide Mr. Bernard with access to the level of physical and mental health care that Mr. Bernard's mental and physical conditions require.

28.     Mr. Bernard requires the use of a "Hoyer Lift" to move him in and out of bed, into his chair, and into and out of the bathtub.

29.     Dixon's Hoyer Lift is in a state of disrepair and is unsafe, which results in frequent injuries to Mr. Bernard. Dixon staff have even witnessed Mr. Bernard fall out of the Hoyer lift on several occasions, but, despite this fact, Defendants have refused to replace this outdated equipment.

30.     Because Mr. Bernard is unable to sit up straight in a wheelchair without falling out, Dixon has provided him with a geriatric chair (i.e., "geri chair") which allows him to remain reclining while staff transports him throughout the facility. This geri chair has broken cushioning and is otherwise unstable, however.

31.     On information and belief, employees of Defendants have witnessed Mr. Bernard fall out of this geri chair multiple times while transported because of its instability.

32.     Though Defendants understand that these and other ADA-assistive devices are outdated, broken, and unsafe, Defendants have refused to order replacements.

33.     Employees for Defendants often rely on untrained prisoners to operate the Hoyer lift and geri chair while transporting Mr. Bernard, who often drop Mr. Bernard and cause him further pain and suffering.

34.     As a result of the unwillingness of medical staff to transport Mr. Bernard without pain and risk of injury, Mr. Bernard is denied access to many of the programs, services, or

activities offered at Dixon. These activities include, but are not limited to, yard/outdoor activities, gym, recreation, educational classes, religious services, occupational therapy, rehabilitation, and other programming.

### C. Denial of Personal Hygiene Assistance

35.     At the time of Mr. Bernard's transfer to Dixon, he was, and remains, in need of assistance performing basic activities, including bathing, toileting, changing his clothes, grooming, and other daily personal hygiene needs. Among other things, Mr. Bernard has no control over his bowels and wears a diaper that must be changed at regular intervals.

36.     On information and belief, only one nurse and nurse's assistant are assigned to the Health Care Unit each shift. As a result, Mr. Bernard is deprived of effective and immediate assistance when he needs a bath, change of clothes, or a diaper change.

37.     Staff often neglect to assist Mr. Bernard with his daily hygiene needs, causing Mr. Bernard to lay in his own excrement for many hours at a time.

38.     At times Mr. Bernard lies in his cell almost completely naked and immobile. As a result, Mr. Bernard has developed painful rashes and sores from his skin's contact with his own waste. He has gone months at a time without a bath or shower.

39.     Due to the demolished padding and fissures in Mr. Bernard's geri chair, Mr. Bernard's chair becomes unsanitary when he is made to sit for hours in a soiled diaper. Wexford acknowledged that Mr. Bernard's geri chair has become unsanitary and authorized the provision of a replacement chair on November 10, 2021. Wexford has subsequently provided Mr. Bernard with another geri chair, which was similarly broken and damaged.

40.     Mr. Bernard has still not received a working replacement chair that allows him to ambulate and can be adequately cleaned and sanitized.

41.     Employees for Defendants often ordered untrained prisoners to perform personal hygiene tasks for Mr. Bernard. Mr. Bernard has been dropped repeatedly by untrained prisoners who are ordered to provide such care and as a result has been injured, including injuries to his head, lip, back, arm, leg, shoulder, wrist, and broken teeth.

42.     For example, staff for Defendants have ordered untrained prisoners to cut Mr. Bernard's fingernails and toenails. On one occasion, this procedure was done improperly leading to an infection.

43.     Dixon's staff, including medical staff and security officers, have permitted other prisoners to sexually assault Mr. Bernard.

44.     Richard Milan, a prisoner Defendants use as a medical aid in the facility, has sexually assaulted Bernard several times by touching his genitals.

45.     On information and belief, Dixon staff knew of this occurrence and continued to allow Milan to assault Mr. Bernard.

**D.     Denial of Legal Assistance and Courtroom Access**

46.     From the time Mr. Bernard had arrived at Dixon in September 2019 until at least January 27, 2020, Mr. Bernard had been denied equal access to his attorneys to the same extent as prisoners without severe disabilities.

47.     On January 27, 2020, at approximately 3:00 pm, Mr. Bernard was taken downstairs from the medical unit by two unknown prisoners in his geri chair for an attorney visit. While waiting for the visit Mr. Bernard's bowels moved and bladder released. Dixon's security personnel refused Mr. Bernard's requests that he be changed or cleaned and permitted the prisoners to continue transporting Mr. Bernard to the visiting room. The prisoners dropped Mr. Bernard while transporting him and Mr. Bernard began vomiting. Mr. Bernard was brought to

his attorney visit in a soiled condition. While being escorted back to the medical unit, the prisoners transporting Mr. Bernard dropped him again and one of them assaulted Mr. Bernard. Once back in the medical unit, the only medical staff, a nurse and CNA, were unable to lift Mr. Bernard. Lieutenant Granger and two officers had to had to assist but dropped Mr. Bernard, causing injury to his back.

48.     After this incident, Mr. Bernard's attorneys were allowed to visit him in person in the infirmary. But Mr. Bernard remains unable to access the law library and is often deprived access to his own court hearings.

49.     Because Mr. Bernard cannot access the law library due to his disability, he has requested a law library kiosk to be installed in an area where he can readily access it from his geri chair.

50.     Rather than provide Mr. Bernard with this kiosk, IDOC instead requires Mr. Bernard to request individual materials from law clerks at the library. This does not enable Mr. Bernard to perform the research himself, and he is often forced to pay for materials that are not ultimately useful or related to his legal research questions.

51.     Mr. Bernard also has requested a legal aid to perform functions such as mailing materials and carrying legal boxes full of discovery and court documents. Because IDOC has not provided Mr. Bernard with a legal aid, important documents are rendered inaccessible, and Mr. Bernard cannot easily access the mail to send documents to his attorneys or the courts.

52.     On February 24, 2020, Mr. Bernard was forced to miss a court appearance to defend himself in a parental rights case. IDOC staff had attempted to place Mr. Bernard in a wheelchair during transport, but Mr. Bernard continually fell off the wheelchair due to his inability to sit upright. Because IDOC staff refused to provide Mr. Bernard with adequate

transportation services for him, Mr. Bernard could not appear at his hearing and was forced to seek a continuance.

53.     On February 27, 2020, IDOC arranged for Mr. Bernard's transportation via ambulance for Mr. Bernard to appear at his next family court hearing. But Wexford and IDOC staff refused to accompany him to assist with necessary diaper changes while in transport and in court.

54.     In the hearing, Mr. Bernard noted to the court that he had not had his diaper changed since 6:30 am and was forced to endure this proceeding while sitting in his own feces. Mr. Bernard informed the court that he was in need of help and was concerned that the feces was infecting the open sores on his body.

55.     In September 2020 Mr. Bernard was scheduled to return to family court for a "best-interest" hearing, at which his parental rights would be adjudicated. IDOC refused to transport Mr. Bernard to the proceedings, and the trial court terminated Mr. Bernard's parental rights.

56.     On October 5, 2020, Mr. Bernard filed a motion for a new trial, informing the court that IDOC failed to make accommodations to allow medical aides to be present during court proceedings to handle his personal hygiene needs. This motion was denied, and Mr. Bernard appealed.

57.     On April 8, 2021, the appellate court reversed. The court described that IDOC was "not appropriately anticipating Eric's needs," including "its failure to anticipate Eric would need a gurney and an ambulance to attend court." *In re Adoption of T.B.*, 2021 IL App (4th) 200575-U at ¶ 77.

*58.*    The court further stated that "[n]o person should have to endure the indignity" of being "forced to sit in his own feces and suffer injury while doing so…particularly while attempting to protect his or her rights in a court of law." *Id.*

59.    The appellate court instructed IDOC to "ensure [that] Eric's physical and basic needs will be met" when the matter resumed in the trial court below.

60.    Months in advance of a hearing on January 14, 2022, Mr. Bernard filed a motion requesting IDOC to send a nurse accompanying him at his hearing to handle his toileting needs. This motion was granted on November 19, 2022.

61.    Despite this court order, Mr. Bernard was yet again forced to sit in his own urine and feces during his hearing.

62.    Mr. Bernard informed the trial court that Wexford nurses had failed to put a condom catheter on Mr. Bernard in advance of the hearing. Wexford staff had refused to accompany him to the courthouse, in defiance of the court order.

63.    Mr. Bernard started to cry as he explained that his urine was soaking the floor of the courthouse and causing him to itch and burn where it seeped into his sores and rashes.

64.    Mr. Bernard suffered this indignity during the entire proceeding.

**E.    Denial of Mental Health Accommodations**

65.    On April 11, 2021, Mr. Bernard was prescribed prazosin for his PTSD-related nightmare and hyperarousal. Mr. Bernard was also prescribed lithium to target irritability and mood swings.

66.    On April 21, 2021, Mr. Bernard had lit a small fire in his cell to gain the Warden's attention after being deprived access to his peers in recreation and group therapy.

67.     The next day, as punishment for his actions, Wexford employee Nurse Hoffman discontinued Mr. Bernard from lithium and prazosin, medications to address his PTSD and borderline personality disorders, noting that Mr. Bernard "[d]oes not really take accountability for his actions of starting a fire," and is "non-compliant with lithium and prazosin."

68.     This was done despite a same-day determination from Wexford staff members in a mental health disciplinary review of the event that Mr. Bernard's "diagnosed mental illness was not a mitigating factor in the actions resulting from his ticket."

69.     Defendants determined that Mr. Bernard was culpable for his disciplinary infractions, which were not caused by his mental disabilities. These mental health medications were therefore discontinued punitively solely due to his disciplinary infractions, rather than for therapeutic reasons.

70.     After repeatedly requesting to be reinstated on his mental health medications, Mr. Bernard attempted suicide once again by swallowing metal screws.

71.     When Mr. Bernard is placed on crisis watch due to these suicidal episodes, he has been denied baths, dayroom and group activities, and has not been allowed to write Grievances nor put them in a Grievance Box.

72.     To this day, Mr. Bernard is denied mental health medications that are needed to accommodate his long-term and incurable mental disabilities, including PTSD and borderline personality disorder.[1] He remains at risk of depression and suicide.

---

[1] In continuously denying Mr. Bernard access to medication needed to accommodate his long-term mental health disability, Defendants are also in clear violation of the Eighth Amendment's bar on cruel and unusual punishment. They know of his need for the medication and of the adverse effects that Mr. Bernard suffers without it yet continue to deny him the medication. Mr. Bernard does not raise these claims in this complaint in adherence to this Court's Order, *See* Dkt. No. 47. but reserves the right to raise these claims should the Court reconsider its order or if Mr. Bernard's cases are reconsolidated.

73.     Despite this risk, Mr. Bernard's psychiatrist, an employee of Wexford, continuously denies Mr. Bernard medication, explaining that he is merely trying to "split" and "antagonize" staff.

**F.     Denial of Access to Outside Medical Care and Dental Care**

74.     Mr. Bernard is frequently denied access to outside medical care and dental care on the basis of his disability.

75.     Though Dixon offers prisoners dental care at the facility, there exist no portable dental x-ray machines or dental chairs that are designed for disabled prisoners like Mr. Bernard.

76.     Mr. Bernard has requested to receive dental care from an outside dental facility that can adequately receive and treat disabled patients, but Mr. Bernard has yet to receive any such care. As a result, Mr. Bernard has cavities, decaying and broken teeth, and exposed nerves which cause him immense pain and suffering.

77.     Mr. Bernard has been repeatedly denied access to medical care from outside facilities.

78.     On information and belief, Mr. Bernard waited over two years for Defendants to schedule a follow-up appointment with his neurologist, whom he had not seen since his release from UIC in 2019.

79.     When Mr. Bernard finally received an appointment scheduled for January 2022, staff could not adequately transport him. Mr. Bernard was forced to postpone his appointment.

80.     Mr. Bernard was finally able to receive another appointment to see his neurologist in March 2022, to be transported via ambulance. On the day of his appointment, however, Mr. Bernard was informed by IDOC staff that the ambulance was "cancelled."

81.     Transportation via ambulance is not a reliable mode of transportation, as the ambulance is reserved for individuals experiencing medical emergencies. In at least one instance, Mr. Bernard was deprived access to a preexisting medical appointment because the ambulance was called to handle a different patient's emergency call.

82.     When Mr. Bernard was finally able to be transported via ambulance to the neurologist for an MRI, Wexford staff did not accompany him in transport and at his appointment to assist with any diaper changes Mr. Bernard needed. As a result, the MRI was canceled due to Mr. Bernard wearing a soiled diaper.

### G.      Complete Isolation from Family and Peers

83.     Since arrival at Dixon on September 6, 2019, and for roughly two years while in the infirmary, Mr. Bernard has been left to deteriorate in near-total isolation from family and his peers.

84.     Mr. Bernard was repeatedly denied physical accommodations, such as transportation assistance, that would allow him to attend group therapy sessions, recreation, and day room to socialize with his peers while confined to the infirmary unit of Dixon.

85.     Defendants were well-aware that Mr. Bernard's mental health would struggle because of this isolation. In fact, Wexford mental health staff had explicitly included group therapy and social interaction as integral parts of Mr. Bernard's mental health treatment plan.

86.     Despite this fact, Defendants refused to provide Mr. Bernard with socialization and group therapy. Mr. Bernard's "group" therapy consisted of one-on-one therapy with a qualified mental health provider, where no other prisoners were present.

87.     During a multidisciplinary staff meeting held on February 16, 2022, regarding Mr. Bernard's progress, IDOC's Northern Regional Psychologist Administrator noted that resident

14

treatment unit programming level of care "is not possible" for patients like Mr. Bernard in an infirmary setting, and that a referral to another facility is warranted to provide Mr. Bernard with more adequate programming.

88.     As part of Mr. Bernard's mental health treatment plan, he is entitled to up to ten hours of unstructured out-of-cell time a week. Though Mr. Bernard repeatedly requested this out-of-cell time, it was often denied for reasons such as "operational availability."

89.     When Mr. Bernard was later offered out-of-cell time, he was nevertheless denied access to outdoor recreation solely because he lived in Dixon's infirmary.

90.     On March 17, 2021, a Wexford qualified mental health practitioner reported that in lieu of outdoor recreation, he had a weekly one-on-one meeting with a therapist to "address his leisure needs." On information and belief, Mr. Bernard was denied access to outdoor recreation from his arrival at Dixon in September 2019 until at least July 2021.

91.     Employees have informed Mr. Bernard that he cannot see visitors because he is too incapacitated to travel from the infirmary to the visitor center. On information and belief, employees for Defendants have stated that only those individuals who can walk or can sit in a wheelchair can see visitors.

92.     Defendants are well-apprised that Mr. Bernard is being denied access to visitation services due to his physical incapacitation but have not provided any accommodations to allow Mr. Bernard access to visitation services.

93.     Though Mr. Bernard's attorneys have been granted access to visit him in the infirmary, Mr. Bernard's family has not.

94.     As a result, Mr. Bernard has not seen his family, including his children, since September 2019.

95.     Worse still, Mr. Bernard cannot access video visitation services because the video screen is positioned for individuals who are capable of positioning themselves upright in a chair to look directly at the screen. Because Mr. Bernard cannot sit upright, his family cannot see him when he makes a video call. They haven't seen his face in over two years.

96.     Though Mr. Bernard can access the prison telephones while in his geri chair, he cannot propel himself to the phone area. Mr. Bernard does not always have prison staff or other prisoners available to move him to the telephone area so he often must forego calls with friends and family due to his disability.

97.     Moreover, unlike other prisoners who have the privacy of a telephone booth for their calls, the ADA-compliant phone does not have a privacy booth. Mr. Bernard is therefore not afforded the same level of privacy as other prisoners during his telephone calls.

**H.     Notice**

98.     Mr. Bernard has filed more than 100 grievances detailing the discrimination he has suffered on the basis of his disability, including all of IDOC and Wexford's failures to provide accommodation. Such grievances provide notice to the IDOC and Wexford staff about Mr. Bernard's disabilities and his need for accommodations to access the programs, services, or activities offered at Dixon.

99.     Mr. Bernard has also made personal complaints to Warden Varga, Warden Nicklaus, Warden Tack, Wexford Nurses Carpenter and Dacie, and other Unknown Medical Staff regarding the discrimination he has faced by virtue of his physical and mental disabilities.

100.     On information and belief, Wexford has been made aware of Mr. Bernard's need for accommodations via multiple sources aside from Mr. Bernard himself, including through its own staff, IDOC personnel, court orders and decisions in Mr. Bernard's paternity case, and Mr. Bernard's multiple lawsuits against Wexford.

101.    In the Fall of 2020, IDOC Director Rob Jeffries visited Dixon's medical unit and personally observed Mr. Bernard in a soiled and un-cared for condition. Mr. Bernard also made a personal complaint to Director Jeffries about his condition and treatment at that time.

<u>Count I</u>
**42 U.S.C. § 12101 – Americans with Disabilities Act**
**Against All Defendants**

102.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

103.    Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

104.    IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

105.    Department of Justice regulations implementing Title II of the ADA state that its protections extend "to prisons operated by public entities directly or through contractual or other relationships." 28 CFR 35.152(a). Because Wexford has contracted with the state of Illinois to provide medical services to prisoners within IDOC, Wexford is a public entity subject to the ADA.

106.    Mr. Bernard has mental and physical disabilities within the meaning of the ADA. He was otherwise qualified to participate in programs, services, or activities offered by the IDOC, including but not limited to: medical, dental, and mental health services; recreational activities; occupational and physical therapeutic services; religious programming; outdoor activities; educational programming; visitation and telephone services; personal hygiene services; and legal services.

107.    Under Title II of the ADA and 28 C.F.R. § 35.130(a), IDOC and its contractual agents are responsible for ensuring that individuals in its custody with disabilities are provided

17

with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

108.   Defendants IDOC and Wexford violated Title II of the ADA by failing to provide Mr. Bernard with necessary accommodations to access the programs, services, and activities described herein.

109.   Defendants also subjected Mr. Bernard to overt discrimination on the basis of his disability by knowingly allowing other prisoners to sexually and physically assault Mr. Bernard, solely because he is paralyzed and unable to protect himself from attack.

110.   Defendants had knowledge that harm to Mr. Bernard's federally protected rights under the ADA was substantially likely and Defendants failed to act upon that likelihood.

**Count II**
**29 U.S.C. § 701 of the Rehabilitation Act**
**Against All Defendants**

111.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

112.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that "no otherwise qualified individual with a disability in the United States… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…."

113.   Both IDOC and Wexford receive federal financial assistance and offer programs and activities to prisoners incarcerated at Dixon.

114.   Mr. Bernard has mental and physical disabilities within the meaning of the Rehabilitation Act. He was otherwise qualified to participate in programs, services, or activities

offered by Defendants, including but not limited to: medical, dental, and mental health services; recreational activities; occupational and physical therapeutic services; religious programming; outdoor activities; educational programming; visitation and telephone services; personal hygiene services; and legal services.

115.    Under the Rehabilitation Act, IDOC and Wexford are responsible for ensuring that individuals in its custody with disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

116.    Defendants IDOC and Wexford violated the Rehabilitation Act by failing to provide Mr. Bernard with necessary accommodations to access the programs, services, and activities described herein.

**Count III**
**Title III of the ADA**
**Against Wexford**

117.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

118.    Wexford can reasonably accommodate Mr. Bernard's disabilities, so as not to exclude him from participation in, or deny him the benefits of, federally-funded services, programs, or activities by reasonably accommodating Mr. Bernard's mental and physical disabilities.

119.    Wexford fails to reasonably accommodate Mr. Bernard's known disabilities, notwithstanding that such accommodations are not an undue hardship.

120.    Wexford wrongfully discriminates against Mr. Bernard on the basis of his disabilities in the "full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations" that Wexford provides to other prisoners incarcerated by IDOC. *See* 42 U.S.C. § 12182(a).

121.    Wexford, as a contracted medical care provider of IDOC, through its agents, employees, or representatives, acted and acts with deliberate, reckless, knowing, or intentional disregard for the rights, health, and safety of Mr. Bernard, which proximately caused him harm.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Eric Bernard respectfully requests that this Court enter a judgment in his favor and against Defendants Illinois Department of Corrections and Wexford Health Sources, Inc., and respectfully asks that this Court:

a.    Enjoin Defendants continued discrimination and specifically order Defendants to provide Plaintiff:

  i.    A new, functional electric geri chair, an automatic electric bed, and functioning hoyer lift and slings;

  ii.    Access to the law library twice per week;

  iii.    Access to the chapel once per week;

  iv.    Access to daily mental health psychotherapy

  v.    Comprehensive physical therapy;

  vi.    Outside dental care for implants;

  vii.    Personal hygiene care while outside of Dixon, including at court appearances and doctor's visits;

  viii.    Access to visitation services;

  ix.    Ensure sufficient nursing/medical staff for the above and all of his personal care, and no use of inmates or security staff for the same.

b.  Award compensatory damages, punitive damages, attorneys' fees and

costs, and any other relief this Court deems just and appropriate.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all claims so triable.

Dated: May 18, 2022

Respectfully Submitted,

/s/ Kelly Jo Popkin
Kelly Jo Popkin
Attorney for Eric Bernard

Kelly Jo Popkin
Michael Kanovitz
Sarah Grady
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
popkin@loevy.com

Oren Nimni*
RIGHTS BEHIND BARS
416 Florida Ave NW #26152
Washington, D.C. 20001
(202) 540-0029
oren@rightsbehindbars.org

*Admission by *pro hac vice* pending